WINMAR COMPANY, INC., Plaintiff,

v.

TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Defendant.

No. 92 Civ. 1793 (SWK).

United States District Court, S.D. New York.

Dec. 9, 1994.

526

Satterlee Stephens Burke & Burke by Robert M. Callagy, Jan R. Uhrbach, New York City, for plaintiff.

Fried, Frank, Harris, Shriver & Jacobson by Marc P. Cherno, Honey L. Kober, David McMillin, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this dispute involving an income guaranty executed in conjunction with a real estate sale, defendant Teachers Insurance and Annuity Association of America ("Teachers") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment dismissing plaintiff Winmar Company Inc.'s ("Winmar") First and Second Causes of Action and awarding relief on Teachers' Second Counterclaim. For the reasons set forth below, Teachers' motion is granted in part and denied in part.

### BACKGROUND [1]

#### I. The Building Sale

In 1985, Winmar owned a building located at 411 East Wisconsin Avenue in Milwaukee, Wisconsin (the "Building") through its subsidiary, Winmar of Wisconsin, Inc.[2] Teachers, a national pension and insurance organization, was the holder of a mortgage on the Building. In late 1985, Winmar approached Teachers with an offer for Teachers to purchase the Building. On December 23, 1986, after extensive negotiations, the parties were able to reach an agreement and the Building was sold to Teachers.

1. Unless otherwise indicated, the following statement of undisputed facts is derived from Defendant's 3(g) Statement of Material Facts; Plaintiff's 3(g) Counter–Statement of Material Facts; Defendant's Memorandum of Law in Support of its Motion for Partial Summary Judgment; and Plaintiff's Memorandum of Law in Opposition to Defendant's Motion.

2. For purposes of this motion, the Court's reference to "Winmar" shall include Winmar of Wisconsin, Inc., unless otherwise indicated.

In connection with the sale, Winmar executed an Income Guaranty,[3] promising that Teachers would receive a certain amount of income as owners of the Building. *See* Income Guaranty, annexed to Teachers' Exhibits as Exh. "PX–1," at ¶ 1. Specifically, the Income Guaranty provided, in part, that:

> To induce [Teachers] to enter into the Agreement of Sale and to purchase the Premises, [Winmar] hereby represents, agrees, warrants and covenants as follows: From and after the date hereof and until and including December 31, 1989, [Winmar] hereby unconditionally guarantees to [Teachers] that Net Operating Income of the Premises will not be less than $495,000 per month.[4]

*Id.* The Income Guaranty provided further that:

> In the event that, as of the end of any calendar month, Net Operating Income for the calendar year in which such month occurs ... is less than the product of $495,000 and the number of months elapsed in such calendar year during the term of this guaranty ... the difference between such product and the Net Operating Income amount is referred to herein as the *"Shortfall"* for such year. The undersigned shall pay the amount of any such Shortfall to you within ten (10) days of the receipt of written notice from you of the amount of the Shortfall.

*Id.* at ¶ 2 (emphasis in original). Accordingly, under this provision, Winmar was obligated to pay Teachers promptly for any shortfall in Net Operating Income in any given month, less surplus accumulated in prior

months above the $495,000 per month guarantee.

At the same time, the parties entered into a Management Agreement which provided that, after the sale, Winmar would continue to manage the Building during the term of the Income Guaranty. *See* Complaint at ¶ 10. Under the Management Agreement, Winmar would "exercise control over the operating results" of the Building, thereby retaining control over Teachers' Net Operating Income and minimizing its potential obligations under the Income Guaranty. *Id.* The Management Agreement provided further that Teachers would have the right to terminate Winmar's management of the Building under certain circumstances. *Id.*

## II. The Income Guaranty Dispute

### A. Paragraph 14(a)

The Income Guaranty provided that, in the event that Teachers terminated the Management Agreement and Winmar no longer managed the Building, Net Operating Income would be re-calculated. Specifically, Paragraph 14(a) of the Income Guaranty ("Paragraph 14(a)") stated:

> In the event the Management Agreement is terminated by [Teachers] during the term of this guaranty the liability of the undersigned hereunder shall be limited as follows: (a) With respect to the remainder of the year in which such termination occurs, for the purposes of this guaranty, Net Operating Income shall be deemed to be the *lesser* of actual Net Operating Income or Net Operating Income as calculated based on the Operating Budget.[5]

---

3. The Income Guaranty expressly provided that it "shall be construed and enforced in accordance with the laws of the State of New York." *See* Income Guaranty, annexed to the Exhibits in Support of Teachers' Motion for Partial Summary Judgment ("Teachers' Exhibits") as Exh. "PX–1," at ¶ 10.

4. The Income Guaranty defined "Net Operating Income" as "the result obtained by from subtracting Gross Rentals ... all operating expenses that are customary for first class office buildings in Milwaukee, or are otherwise reasonable in connection with the operation of the Premises." *See* Income Guaranty, annexed to Teachers' Exhibits as Exh. "PX–1," at ¶ 1(a). Operating expenses were defined to include expenditures such

as the maintenance of elevators, restrooms, lobbies and common areas, general repairs, janitorial services, insurance costs, water, electricity, real estate and personal property taxes, employee wages and management fees. *Id.* The term "Gross Rentals" was defined as "all cash amounts paid or payable to [Teachers] under or with respect to Leases existing on the date hereof or signed by [Teachers] and under which Tenants have occupied the leased premises and have commenced paying rent." *Id.*

5. Paragraph 14(a)'s inclusion of the term "Operating Budget" referred to Winmar's projections of Net Operating Income as calculated in its own budget forecasts.

*See* Income Guaranty, annexed to Teachers' Exhibits as Exh. "PX–1," at ¶ 14(a) (emphasis added). In the complaint, Winmar alleges that Paragraph 14(a) contains a drafting error. *See* Complaint at ¶ 13. In brief, Winmar states that the word "lesser" should read "higher," and that Winmar was unaware of this error when it executed the contract. *Id.* According to Teachers, however, the parties thoroughly negotiated all aspects of the Income Guaranty and the language in Paragraph 14(a) is an accurate reflection of the agreement ultimately reached by the parties.

**B. The Settlement Agreement**

On February 5, 1988, after a dispute regarding the parties' obligations under the Income Guaranty, the parties entered into a settlement agreement (the "Settlement Agreement"), under which the Management Agreement was terminated and control of the Building was transferred from Winmar to Teachers. *See* Settlement Agreement, annexed to Teachers' Exhibits as Exh. "RX–2," at 3340. The Settlement Agreement provided further that "[t]he Income Guaranty is in all respects ratified and confirmed and is in full force and effect as expressly modified hereby." *Id.* at 3347.

As a result of the Settlement Agreement and the termination of the Management Agreement, Paragraph 14(a) was triggered. Thereafter, Winmar notified Teachers of the alleged error in the language of the Income Guaranty and requested its correction to reflect the provision's intended meaning. After Teachers refused Winmar's request, Winmar commenced the present action.

**C. The Draft Proposals and Mark-ups**

Prior to execution of the Income Guaranty on December 23, 1986, Winmar, Teachers and their respective attorneys exchanged several drafts of the Income Guaranty. Specifically, on October 31, 1986, Teachers produced an initial draft of the Income Guaranty (the "October 31 Draft"). The October 31 Draft contained no special provision concerning Winmar's obligations in case of the termination of the Management Agreement. *See*

October 31 Draft, annexed to Teachers' Exhibits as Exh. "PH–7," at 773.

According to Winmar, the absence of any such provision caused concern because Winmar did not want to be responsible for a shortfall at a time when it no longer exercised any control over the income and expenses of the Building. *See* Deposition of Thomas Brockmiller, taken on 9/24/92 ("Brockmiller Dep."), annexed to the Deposition Excerpts in Support of Teachers' Motion for Partial Summary Judgment ("Teachers' Excerpts") and Winmar's Deposition Excerpts in Opposition to Teachers' Motion for Partial Summary Judgment ("Winmar's Excerpts"), at 89, 104; Deposition of Susan Rahm, taken on 2/10/93 ("Rahm Dep."), annexed to Teachers' Excerpts, at 101. Consequently, on November 4, 1986, Winmar made several written comments on the October 31 Draft (the "November 4 Mark-up"), including the following statement: "[I]ncome guaranty terminates if management agreement terminates for any reason." *See* Deposition of Simon David Cices, taken on 2/9/93 ("Cices Dep."), annexed to Teachers' Excerpts, at 122: *see also* November 4 Mark-up, annexed to Winmar's Deposition Exhibits in Opposition to Teachers' Motion for Partial Summary Judgment ("Winmar's Exhibits") as Exh. "CX–4," at 6. This proposal was rejected, however, in oral discussions occurring some time prior to November 9, 1986. *See* Cices Dep. at 163–64. According to William H. Goebel ("Goebel"), an in-house lawyer for Teachers, Teachers rejected Winmar's proposal because Teachers refused to jeopardize its guaranteed $495,000 per month Net Operating Income in the event it decided to terminate the Management Agreement. *See* Deposition of William H. Goebel, taken on 1/12/93 ("Goebel Dep."), annexed to Winmar's Excerpts, at 97.

Despite Teachers' rejection of this proposal, Winmar continued to seek a provision that would cap its liability in the event Teachers exercised its right to terminate the Management Agreement. Specifically, Winmar next proposed that upon termination of the Management Agreement, Winmar's liability under the Income Guaranty would be limited to the lesser of actual or budgeted shortfall.

*See* Cices Dep. at 135–36. This concept first appeared in the November 4 Mark-up, which stated: "[U]pon termination of management agreement—our liability is limited to lesser of actual deficit [and] projected deficit as of termination of management agr[eement]." *See* November 4 Mark-up, annexed to Winmar's Exhibits as Exh. "CX–4," at 1. Although Winmar never sent Teachers a copy of the November 4 Mark-up, it did prepare a subsequent mark-up on November 9, 1986 (the "November 9 Mark-up") which was sent directly to Teachers' counsel. *See* Cices Dep. at 61. The November 9 Mark-up included a handwritten statement reading: "14. If the Management Agreement terminates for any reason, then the liability of the undersigned shall equal the lesser of actual shortfalls and projected shortfalls (this term is to be worked out)." *See* November 9 Mark-up, annexed to Winmar's Exhibits as Exh. "CX–8," at 8.

On November 10, 1986, Winmar sent the November 9 Mark-up to Teachers' counsel Goebel and Winmar Vice-president Thomas A. Brockmiller ("Brockmiller"). According to Winmar, it explained to Teachers that the proposed paragraph was necessary because "if the management agreement terminated, Winmar would be in the troublesome situation of having to write checks without having any control of how the money liability is determined or spent, which would be an untenable position for anybody." *See* Cices Dep. at 216. Nonetheless, according to Jeffrey H. Title ("Title"), a Teachers' employee involved with the Building sale, Teachers decided to reject paragraph 14 as proposed in the November 9 Mark-up because it threatened to deprive Teachers of "the amount that [Teachers] had bargained for under the guaranty." *See* Deposition of Jeffrey H. Title, taken on 9/9/92 ("Title Dep."), annexed to Teachers' Excerpts, at 91. Accordingly, on November 26, 1986, Teachers revised the Income Guaranty in several respects (the "November 26 Draft"), eliminating proposed paragraph 14 set forth in the November 9 Mark-up, and sent the revised draft to Winmar. *See* November 26 Draft, annexed to Winmar's Exhibits as Exh. "CX–12," at 9.

Upon receiving the November 26 Draft, Winmar once again edited the Income Guaranty adding similar language with respect to Winmar's obligations in the event of the termination of the Management Agreement (the "November 26 Mark-up"). Specifically, Winmar again included the following provision: "15. If the Management Agreement terminates for any reason whatsoever, then the liability of the undersigned shall equal the lesser of actual shortfalls [and] projected shortfalls (this term is to be worked out)." *See* November 26 Mark-up, annexed to Winmar's Exhibits as Exh. "CX–12," at 9. Winmar also revised the November 26 Draft to include a clarification for the term "projected shortfalls" as follows: "actual budget for that year [and] then reasonable budget for the rest." *Id.* The November 26 Mark-up was then sent back to Teachers for its review.

According to Teachers, it became disturbed by Winmar's persistence in including the provision regarding Winmar's liabilities in the Income Guaranty. Accordingly, Teachers inserted a provision in the Income Guaranty using Winmar's budget projections as a floor to Winmar's liability, thereby eliminating any incentive for Winmar to manipulate the budget figures to inflate actual Net Operating Income above its own projections. *See* Zizzo Dep. at 66; Goebel Dep. at 98; Title Dep. at 107–08; 113–15.

Accordingly, on December 8, 1986, Teachers prepared another draft of the Income Guaranty (the "December 8 Draft"), containing the following provision:

14. In the event the Management Agreement is terminated by [Teachers] during the term of this guaranty the liability of the undersigned hereunder shall be limited as follows: (a) With respect to the remainder of the year in which such termination occurs, for the purposes of this guaranty, Net Operating Income shall be deemed to be the *lesser* of actual Net Operating Income or Net Operating Income as calculated based on the Operating Budget (as such term is defined in the Management Agreement).

*See* December 8 Draft, annexed to Winmar's Exhibits as Exh. "CX–16," at 9 (emphasis added). Teachers claims that this provision

reflected its desire to impose a floor on Winmar's liability and was intended as a counter-proposal for Winmar's approval. Moreover, according to Teachers, at about the same time, its counsel told Winmar representatives that Teachers would not accept Winmar's proposed liability cap. *See* Zizzo Dep. at 57.

According to Winmar, however, the inclusion of this language in the December 8 Draft was not intended as a counter-proposal but rather as an acceptance of Winmar's proposal to limit its liability. In fact, Winmar asserts that, between December 1 and December 8, Winmar's counsel had reached an oral agreement with Teachers' counsel that the Income Guaranty would include a liability provision such as the one proposed by Winmar. *See* Cices Dep. at 242–43. Winmar's counsel was unable to recall several details of the oral agreement. As evidence of Teachers' acceptance of Winmar's proposal, however, Winmar points to a handwritten notation on the November 26 Draft, which states: "[I]f Management agreement term[inates] liab[ility] limited to lesser of actual or budget for rest of that y[ear] and budget for after reas[onably] determ[ined] by Teachers." *See* November 26 Draft, annexed to Winmar's Exhibits as Exh. "PX–12," at 368.

Winmar claims that neither its employees nor its counsel noticed the change in the language upon receipt of the December 8 Draft. *See* Cices Dep. at 258–59. Subsequently, the December 8 Draft was circulated among Winmar's attorneys, who read the proposed Income Guaranty at least four times before execution of the agreement. *See id.* at 241, 248, 261, 272, 279–81.

### D. Correspondence

Winmar also points to certain correspondence between the parties as evidence that Paragraph 14(a) was drafted incorrectly. On October 16, 1987, Winmar Vice–President Brockmiller sent a facsimile to Teachers employee Martin Lord ("Lord"), in which he stated:

> As promised, I am enclosing both a summary of the 1988 operating budget as well as the detailed backup for [the Building]. These materials are to be used as a basis

for determining cash shortfall during calendar year 1988. . . . The difference between annual debt service on your mortgage of $5,940,000, and projected net income for 1988 of $5,636,000 is $304,000.

*See* facsimile from Brockmiller to Lord of 10/16/87, annexed to Winmar's Exhibits as Exh. "PX–19." Subsequently, on October 27, 1987, Brockmiller wrote to Lord, stating:

> I was pleased to learn of your plans to travel to Milwaukee this week to review the operating budget for [the Building] with Dick Amidei. Obviously, these budget projections related directly to Winmar's obligations under the Income Guaranty which is an important point to resolve with respect to the Termination Agreement.

*See* letter from Brockmiller to Lord of 10/27/87, annexed to Winmar's Exhibits as Exh. "PX–20." Finally, on November 30, 1987, Brockmiller wrote to Teachers executive Joseph Luik ("Luik"), informing him that:

> We previously submitted an operating budget for 1988 which Martin indicated is generally acceptable. (Attached is another copy for your reference). Using projected Net Operating Income of $5,636,000 compared with annual debt service of $5,940,000, the projected shortfall which would be covered by the Income Guaranty is $304,000. Since the Letter of Credit Agreement provides for a minimum amount of $500,000, we are asking for your concurrence with this latter figure prior to making arrangements with our bank for prompt renewal of the letter of credit.

*See* letter from Brockmiller to Luik of 11/30/87, annexed to Winmar's Exhibits as Exh. "PX–22."

Teachers did not respond to these communications. According to Winmar, Teachers' failure to correct Brockmiller is evidence that Teachers must have agreed with Winmar's explanation of Paragraph 14(a). Teachers disputes Winmar's interpretation of these communications, however, arguing that they are consistent with the language of Paragraph 14(a) as written. Specifically, Teachers contends that these communications sim-

ply state that the budgeted Net Operating Income would need to be considered in relation to actual Net Operating Income in calculating shortfall under the Income Guaranty.

## III. The Present Action

On February 17, 1993, Winmar filed an amended complaint,[6] setting forth several allegations arising out of the agreements between the parties in connection with the sale of the Building. Specifically, Winmar alleges that, "[b]y mutual mistake of Winmar and [Teachers] or, alternatively, by the mistake of Winmar and the fraud of [Teachers] in concealing its knowledge of the mistake, paragraph 14 of the Income Guaranty is incorrectly drawn and does not state the actual agreement between Winmar and [Teachers]." Complaint at ¶ 19. Accordingly, Winmar seeks reformation of the contract to reflect the parties' intentions and damages incurred as a result of basing Winmar's liability on the flawed contractual provision (First Cause of Action).[7]

Winmar alleges further that Teachers breached the Income Guaranty by including "capital expenditures and non-operational costs not properly chargeable," such as real estate taxes incurred by the Building in 1986, in calculating Net Operating Income under the Income Guaranty (Second Cause of Action). Paragraph 1 of the Income Guaranty defined Net Operating Income as "Gross Rentals" minus various "operating expenses." *See* Income Guaranty, annexed to Teachers' Exhibits as Exh. "PX–1," at ¶ 1(a). The Income Guaranty defined "operating expenses" to include, *inter alia*, certain taxes incurred by the Building, including:

> All real estate and personal property taxes and assessments and other governmental levies and charges of any nature whatsoever, general or special, ordinary or extraordinary, which may be levied or assessed, or which may become a lien upon the Premis-

es or the Improvements or any part thereof.

*Id.* According to the Income Guaranty, all operating expenses, including real estate taxes, were to be computed "on the accrual basis of accounting." *See id.;* Plaintiff's Response to Defendant's Requests for Admission, annexed to Teachers' Notice of Motion as Exh. "E," at No. 39. According to Teachers, under the "accrual basis of accounting" method, expenses are assigned to the year for which they are attributable even if they are not actually paid until a subsequent year.

In calculating Net Operating Income for 1987, Teachers subtracted real estate taxes accrued by the Building in 1986.[8] As the Building had incurred real estate taxes in the amount of approximately $1 million in 1986, this calculation had the effect of increasing "operating expenses," thereby lowering Net Operating Income for 1987. This created an additional shortfall of approximately $1 million for which Winmar was deemed liable under the Income Guaranty.

At the same time, however, Winmar credited Teachers with an adjustment in the amount of $1,216,227.56 for real estate taxes incurred by the Building in 1986. This adjustment was implemented pursuant to an agreement of sale executed on December 23, 1986 between Teachers and Winmar's subsidiary, Winmar of Wisconsin, Inc. (the "Agreement of Sale") *See* Agreement of Sale dated Dec. 23, 1986, annexed to Teachers' Exhibits as Exh. "PX–7," at 755. According to Winmar, the use of 1986 real estate taxes as both an "operating expense" in calculating 1987 Net Operating Income and as a closing adjustment pursuant to the Agreement of Sale constitutes an improper double-payment to which it is entitled reimbursement. Moreover, Winmar disputes Teachers' application of the accrual accounting method on the ground that Teachers failed to include real estate taxes paid by tenants as "Gross Rentals" in the year in which the payments were

---

**6.** The original complaint, filed on March 12, 1992, was withdrawn by Stipulation and Order dated January 20, 1993.

**7.** Winmar paid Teachers for shortfalls under the Income Guaranty using Paragraph 14(a) as written as a guideline. Accordingly, Winmar claims

that Net Operating Income was understated up to $1,604,079.98. Complaint at ¶ 23.

**8.** In Milwaukee, real estate taxes are assessed at the end of the calendar year and are therefore due the year after they are incurred.

received. *See* Affidavit of Larry L. Olson, sworn to on May 19, 1994 ("Olson Aff."), annexed to the Affidavit of Robert M. Callagy, sworn to on May 20, 1994, at ¶¶ 7, 9–10. Such an inclusion would have had the effect of increasing "Gross Rentals," thereby decreasing the shortfall amount Winmar was obligated to pay under the Income Guaranty.

Winmar also claims that Teachers breached the Income Guaranty by failing properly to calculate operating costs in 1988 (Third Cause of Action) and 1989 (Fourth Cause of Action). Finally, Winmar alleges that Teachers breached the Management Agreement by failing to reimburse Winmar for costs incurred in providing management services to Teachers between January 1, 1988 and February 5, 1988 (Fifth Cause of Action).

On March 3, 1993, Teachers filed its answer to the amended complaint, denying Winmar's allegations and setting forth two counterclaims. First, Teachers alleges that Winmar has breached the Income Guaranty by failing to pay a balance due in the amount of $1,233,295.55 (First Counterclaim). Second, Teachers claims that it is entitled to recover attorney's fees in connection with defending this action pursuant to paragraphs 3 and 12 of the Income Guaranty (Second Counterclaim).[9]

Teachers now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting it partial summary judgment (1) dismissing Winmar's reformation claim; (2) dismissing Winmar's Second Cause of Action to the extent it seeks reimbursement of real estate taxes; and (3) awarding relief to Teachers on its Second Counterclaim for attorneys' fees incurred in defending against Winmar's Causes of Action against which summary judgment is granted.

For the reasons that follow, Teachers' motion is granted in part and denied in part.

## DISCUSSION

### I. The Reformation Claim

Teachers contends that Winmar's reformation claim is time-barred by the applicable statute of limitations. Teachers argues further that, even if Winmar's claim is timely, summary judgment should be granted on the ground that Winmar cannot prove the existence of either a mutual or unilateral mistake in the drafting of Paragraph 14(a).

### A. Statute of Limitations

As a threshold matter, the Court must determine whether Winmar's reformation claim was commenced within the statute of limitations period. According to Teachers, under New York's choice of law provisions, the Court must apply Washington's three-year statute of limitations to the present case.[10] As Winmar filed this action more than three years after discovering the alleged mistake in the Income Guaranty, Teachers maintains that its claim should be deemed time-barred. Winmar disagrees, arguing that (1) New York's six-year statute of limitations applies pursuant to the parties' express agreement; (2) New York's six-year statute of limitations applies because the action accrued in New York; (3) even if Washington's statute of limitations applies, reformation claims in Washington are also covered by a six-year statute of limitations; and (4) Teachers waived its statute of limitations defense by failing to plead it in its answer pursuant to Rule 8(c) of the Federal Rules of Civil Procedure.

---

**9.** Paragraph 3 of the Income Guaranty provides, in pertinent part, that Winmar would indemnify Teachers:

> Against loss, cost or expenses (including without limitation reasonable attorneys' fees and expenses) by reason of the assertion by [Winmar] of any defense to its obligations hereunder based upon any action or inaction of Seller or of you.

Income Guaranty, annexed to Teachers' Exhibits as Exh. "PX–1," at ¶ 3. Paragraph 12 of the Income Guaranty states:

> 'Attorney's' fees' and 'counsel fees' and the like as used herein shall include fees for the attorneys' services whether outside or within judicial proceedings, including also appellate and bankruptcy court proceedings.

*Id.* at ¶ 12.

**10.** Teachers argues that, under New York's "borrowing statute," the Court must apply Washington's statute of limitations as Winmar's cause of action accrued in Washington. *See* N.Y.Civ. L. & R. § 202 (McKinney 1994).

■ Rule 8(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ... statute of limitations ... and any other matter constituting an avoidance or affirmative defense." Fed.R.Civ.P. 8(c). Failure to raise a statute of limitations defense in the answer to the complaint constitutes a waiver of the defense. *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751–52 (2d Cir.1992); *Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987); *Santos v. District Council*, 619 F.2d 963, 967 n. 5 (2d Cir.1980). An exception to this rule is found in Federal Rule of Civil Procedure 15(a), which provides that "a party may amend the party's pleading ... by leave of the court ... and leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a); *see also Byrd v. Long Island Lighting Co.* 565 F.Supp. 1455, 1462–63 (E.D.N.Y.1983) (granting leave to amend absent undue delay, bad faith, repeated failure to cure deficiency or undue prejudice) *United States v. Continental Ill. Nat'l Bank and Trust Co.*, 889 F.2d 1248, 1254 (2d Cir.1989) (stating that, in exercising its discretion pursuant to Rule 15(a), a court should provide its "justifying reason or reasons consonant with the liberalizing spirit of the Federal Rules").

■ In the instant case, Teachers has failed to provide the Court with any explanation for its failure to plead a statute of limitations affirmative defense in either its original answer or its amended answer. Rather, Teachers focuses on the fact that its statute of limitations defense is meritorious and, therefore, " 'justice so requires' that Teachers be permitted to pursue it." *See* Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment, at 31. If Teachers' position were accepted, however, the purpose of Rule 8(c) would be subverted by any party able to set forth a cognizable affirmative defense. Rule 8(c) makes no such distinction between meritorious and unmeritorious affirmative defenses in its requirement that they be pled at the earliest possible opportunity.

Further, the Court finds that Winmar would be prejudiced if Teachers were permitted to plead a statute of limitations defense at this late stage of the proceedings. As discovery is now closed, Teachers' delay in asserting this defense has prevented Winmar from determining whether Teachers is subject to Washington's long-arm jurisdiction. Teachers' amenability to Washington jurisdiction is important as it may provide grounds for tolling the statute of limitations. *See Summerrise v. Stephens*, 75 Wash.2d 808, 454 P.2d 224, 227–28 (1969). Accordingly, based on Teachers' failure to explain its own delay and the potential prejudice to Winmar, the Court finds that Teachers waived its statute of limitations defense by failing to include it in its answers to Winmar's complaint or amended complaint.

■ In any event, the Court finds that Teachers' statute of limitations defense fails on the merits. Even if the Court were to accept Teachers' argument that Washington's statute of limitations applies to the present case, Winmar's claim would not be time-barred. Although Washington law does not establish a statute of limitations expressly applicable to reformation claims, Washington courts apply a six-year statute of limitations to reformation claims at least to the extent that the claim is based on mutual mistake.[11]

Section 4.16.040(1) of the Washington Revised Code provides that "[t]he following actions shall be commenced within six years: (1) An action upon a contract in writing, or liability express or implied arising out of a written agreement." Wash.Rev.Code § 4.16.040(1) (1994). Washington's Supreme Court has observed that this provision "refers not only to written contracts, but to 'liability express or implied arising out of a written agreement.' " *See Sanwick v. Puget Sound Title Ins. Co.*, 70 Wash.2d 438, 423 P.2d 624, 629 (1967) (quoting Wash.Rev.code § 4.16.040(2)). "This statute is unique, and encompasses a much broader class of actions than do the more limiting statutes." *Id.*

11. As the Court finds that Winmar's reformation claim based on unilateral mistake is without merit, *see infra* at 537–538, the Court need not address the statute of limitations issue with respect to that claim.

In the case at hand, Winmar's reformation claim founded on mutual mistake is based on a written agreement between the parties. Any liability incurred as a result of reformation of the Income Guaranty will arise directly out of this written agreement. Moreover, to the extent Winmar's claim is based on mutual rather than unilateral mistake, there is no basis for applying Washington's three-year statute of limitations for fraud.[12] *See State ex rel. Pierce County v. King County,* 29 Wash.2d 37, 185 P.2d 134, 137 (1947) (stating that "[t]he rule as to laches and the statute of limitations in cases of reformation of contracts based on mistake is different from that governing fraud cases"). Accordingly, a six-year statute of limitations is applicable to Winmar's reformation claim based on mutual mistake. *See Unigard Sec. Ins. Co. v. Kansa Gen. Ins. Co.,* No. 90 Civ. 1693, 1992 U.S. Dist LEXIS 20677, at *19–20 (W.D.Wash. Nov. 9, 1992) (*"Unigard"*) (applying a six-year statute of limitations period to defendant's counterclaim for rescission of a contract based on mutual mistake and breach of contract).[13] As the parties do not dispute that this action was commenced within six years after discovery of the alleged mistake in the Income Guaranty, Winmar's claim is timely. The Court now turns to the merits of Winmar's reformation claim.

## B. Standard of Law

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and may discharge this burden by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. at 158–59, 90 S.Ct. at 1608–09; *Gallo v. Prudential Residential Serv.,* 22 F.3d 1219, 1223 (2d Cir.1994). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative.

---

**12.** Section 4.16.080(4) of the Washington Revised Code establishes a three-year statute of limitations period for actions based on fraud. *See* Wash.Rev.Code § 4.16.080(4) (1994).

**13.** Teachers disputes the applicability of *Unigard* to the case at bar, arguing that a six-year statute of limitations would not be applied in a contract dispute involving proof of the meaning of a contract through alleged oral agreements, drafts and negotiations. The Court finds Teachers' attempt to distinguish *Unigard* unpersuasive, however, as the *Unigard* court similarly confronted substantial prior writings and negotiations in resolving the parties claims.

Moreover, Teachers' reliance upon *Ingalls v. Angell,* 76 Wash. 692, 137 P. 309, 310 (1913), is misplaced. In that case, the court determined that a three-year statute of limitations applied to a claim involving an alleged oral contract. Specifically, the court observed that "[a]n action upon a contract, express or implied, which is *not in writing,* and does not arise out of a written instrument may be begun within a period of three years." *Id.* (emphasis added). In contrast, the dispute between the parties at issue arises out of a written contract between the parties.

*Id.* at 249–50, 106 S.Ct. at 2510–11; *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12–15 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

To determine whether the moving party has met his or her burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of summary judgment. *See, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to establish his or her burden under Rule 56. *Celotex Corp. v. Catrett,* 477 U.S. at 330 & n. 2, 106 S.Ct. at 2556 & n. 2 (Brennan, J., dissenting). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

### C. Mutual or Unilateral Mistake

Teachers argues that Winmar has failed to demonstrate an issue of material fact as to whether a mutual or unilateral mistake oc-curred in the execution of the Income Guaranty. Specifically, Teachers maintains that Winmar has failed to produce any evidence that Teachers was mistaken in executing the language set forth in Paragraph 14(a) or that it perpetrated fraud upon Winmar in negotiating the agreement.

■ Under New York law, reformation may be granted only in two circumstances: where there has been a (1) mutual mistake; or (2) unilateral mistake coupled with fraudulent concealment by the knowing party. *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 498 N.Y.S.2d 344, 346–47, 489 N.E.2d 231, 232–34 (1986). In a case of mutual mistake, "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *Id.* 498 N.Y.S.2d at 347, 489 N.E.2d at 233–34. In a case of unilateral mistake, "the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement." *Id.*

■ As the thrust of a reformation claim is that the writing does not accurately set forth the agreement reached by the parties, neither the parol evidence rule nor the Statute of Frauds bars proof of the actual agreement. *Id.* To compensate for the danger that a party, "having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract," however, there is a heavy procedural burden that must be overcome by the party seeking reformation. *Id.* The proponent of reformation must demonstrate "in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties." *Id.* (quoting *George Backer Management Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 139, 385 N.E.2d 1062, 1066 (1978)). A party resisting pretrial dismissal of a reformation claim must "tender a 'high level' of proof in evidentiary form." *Chimart Assocs. v. Paul,* 498 N.Y.S.2d at 347, 489 N.E.2d at 234 (quoting *Sagan v. Sagan,* 53 N.Y.2d 635, 438 N.Y.S.2d 782, 783, 420 N.E.2d 974, 975 (1981)). New York courts generally have characterized the required level of proof as proof by "clear and convinc-

ing evidence." *Seebold v. Halmar Constr. Corp.*, 146 A.D.2d 886, 536 N.Y.S.2d 871, 872 (3d Dep't 1989); *see also Westinghouse Elec. Corp. v. New York City Transit Auth.*, 735 F.Supp. 1205, 1218 (S.D.N.Y.1990) (stating that "New York contract reformation rules require that reformation be justified by substantial and convincing evidence"). Against this procedural backdrop, the Court now turns to Winmar's claims.

## 1. Mutual Mistake

▉ In the present case, there is ample evidence from which a factfinder could conclude that Winmar signed the Income Guaranty in the mistaken belief that Paragraph 14(a) was drafted to act as a ceiling on Winmar's liability in the event the Management Agreement was terminated. First, there is only a subtle difference in the language of Paragraph 14(a) between creating a ceiling and imposing a floor on Winmar's liability; the mere substitution of the word "lesser" for "higher" reverses the meaning of the provision. Second, the deposition testimony of Winmar's Vice–President and counsel indicate that Winmar aggressively pursued the insertion of a provision limiting its liability in the event it lost managing control of the Building. *See, e.g.*, Brockmiller Dep. at 89, 101. Teachers as much conceded this point in its own deposition testimony. *See* Zizzo Dep. at 63. Third, according to Winmar's counsel who drafted the Income Guaranty, Winmar was unaware of the change in the language of Paragraph 14(a) as reflected in the December 8 Draft prepared by Teachers' counsel. In fact, Winmar's counsel failed to notice the change in the provision after several readings before the Income Guaranty was executed on December 23, 1986. This evidence, taken together, presents an issue of fact as to whether Winmar was aware of the change in Paragraph 14(a) at the time it executed the Income Guaranty.

▉ In order to sustain its burden of proving the existence of a mutual mistake, however, Winmar must also demonstrate by "high level of proof" that Teachers was similarly mistaken in agreeing to Paragraph 14(a). *See Chimart Assocs. v. Paul*, 498 N.Y.S.2d at 347, 489 N.E.2d at 234 (quoting

*Sagan v. Sagan*, 438 N.Y.S.2d at 783, 420 N.E.2d at 975). To meet this burden, Winmar identifies certain evidence that leads the Court to conclude that there is a genuine issue of material fact as to whether a mutual mistake occurred.

First, the language of Paragraph 14(a) itself appears to be internally inconsistent. Specifically, Paragraph 14(a), as written, provides that Winmar's liability "shall be *limited*" according to the "Net Operating Income as calculated based on the Operating Budget." *See* Income Guaranty, annexed to Teachers' Exhibits as Exh. "PX–1," at ¶ 14(a) (emphasis added). It is undisputed, however, that the language of Paragraph 14(a) acts as a floor on Winmar's liability. According to Winmar, this contradiction is explained by the fact that Teachers mistakenly drafted Paragraph 14(a) to create a floor rather than a ceiling on Winmar's liability. In opposition, Teachers appears to argue that the word "limited" appeared in the final version of the Income Guaranty because a prior version of the provision would have had the potential effect of limiting Winmar's liability. This argument, however, fails to explain why the word "limited" was not removed from the final version of the Income Guaranty. Moreover, a review of the testimony of Teachers executives and its counsel fails to elucidate any rational reason for including the word "limited" in a provision that was not intended to limit Winmar's liability. Although the inclusion of the term "limited" in the Income Guaranty may itself have been a drafting error, the existence of such contradictory language in the same paragraph disputed by Winmar raises an issue requiring resolution by a trier of fact.

Second, Winmar's counsel testified that he reached an oral agreement with Teachers' attorneys during the first week of December 1986 with respect to Winmar's version of Paragraph 14(a). According to Winmar's counsel, this oral agreement occurred just prior to the issuance of the December 8 Draft, which contained the first inclusion by Teachers of a purported floor on Winmar's liability. Although Winmar's attorney is unable to recollect several details of the alleged oral agreement, the Court finds that this

testimony provides some evidence that Teachers intended to draft the Income Guaranty pursuant to Winmar's request.[14]

Third, the correspondence sent by Winmar's Vice–President Brockmiller to Teachers presents further evidence that Teachers was mistaken with respect to the language of Paragraph 14(a). Although a factfinder may conclude, as Teachers suggests, that these letters are consistent with Teachers' understanding of Paragraph 14(a), the Court finds these letters to be subject to varying interpretations that requires resolution at trial.

The cases cited by Teachers do not compel the opposite result. In *Investors Ins. Co. v. Dorinco Reinsurance Co.*, 736 F.Supp. 1260, 1266 (S.D.N.Y.), *aff'd*, 917 F.2d 100 (2d Cir. 1990), this Court granted summary judgment to the defendant dismissing plaintiff's reformation claim on the ground that plaintiff had failed to prove a mutual intent to reach a different agreement. Similarly, in *South Fork Broadcasting Corp. v. Fenton*, 141 A.D.2d 312, 528 N.Y.S.2d 837, 839 (1st Dep't 1988), the court dismissed plaintiff's reformation claim, finding that plaintiff's submission of "selective correspondence [and] deposition excerpts and affidavits ... which state in vague and conclusory terms their various versions of what the agreement should read" was insufficient to meet its burden of proof. In both cases, however, the court was faced with a contract that was unambiguous in setting forth the parties' agreements. *See Investors Ins. Co. v. Dorinco Reinsurance Co.*, 736 F.Supp. at 1262 (stating that the provision in dispute "clearly refers to liability for a portion of actual diminutions of the Security Fund" at issue); *South Fork Broadcasting Corp. v. Fenton*, 528 N.Y.S.2d at 839 (finding the contract's language to be "unambiguous"). Neither case dealt with the unique situation presented here in which the provision in dispute is contradictory on its face.

### 2. Unilateral Mistake

With respect to Winmar's reformation claim based on unilateral mistake, Teachers argues that Winmar has not presented any evidence from which a factfinder reasonably could conclude that Teachers fraudulently concealed the actual language of Paragraph 14(a). The Court agrees.

 In order to succeed on a reformation claim based on unilateral mistake, a plaintiff must demonstrate that "the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement." *Chimart Assocs. v. Paul*, 498 N.Y.S.2d at 347, 489 N.E.2d at 233–34. Under this doctrine, then, a plaintiff bears the burden of proving both its own mistake and fraudulent concealment by the other party. *Id.* at 346–47, 489 N.E.2d at 232–34. Under New York common law, the following elements must be established to sustain an action for fraud: "(1) misrepresentation, concealment or nondisclosure of a material fact; (2) intent to deceive on the part of the defendant; (3) justifiable reliance upon the misrepresentation by the plaintiff; and (4) injury to the plaintiff as a result of such reliance." *National Union Fire Ins. Co. v. Walton Ins., Ltd.*, 696 F.Supp. 897, 902 (S.D.N.Y.1988) (quoting *Idrees v. American Univ. of the Caribbean*, 546 F.Supp. 1342, 1346 (S.D.N.Y. 1982)).

 In the case at hand, the Court already has determined that there is a genuine issue of fact as to whether Winmar mistakenly believed that Paragraph 14(a) was intended to create a ceiling on its liability. Similarly, an issue of fact exists as to whether Teachers misrepresented or concealed the modification in the contract with an intent to deceive Winmar. Nonetheless, Winmar's reformation claim cannot succeed on the basis of unilateral mistake as Winmar cannot establish justifiable reliance. Winmar was

---

**14.** Teachers argues that the alleged oral agreement should not be considered evidence of mutual mistake because Winmar's counsel failed to specify the precise language that the parties had allegedly agreed to. According to Teachers, the vagueness of the alleged oral agreement would render it difficult to determine what the parties

had allegedly agreed to. The Court finds this argument to be without merit, however, as the parties had exchanged numerous written drafts prior to the alleged oral agreement and, therefore, a factfinder easily could identify the terms of the agreement to which the parties may have agreed.

represented by sophisticated counsel who had the ability to read and understand the terms of the Income Guaranty. Winmar cannot now claim that it was entitled to rely upon representations by Teachers and its counsel in lieu of exercising its own independent review of the Income Guaranty. Rather, it was incumbent upon Winmar to ensure that the agreement reflected the prior understanding of the parties. *See Investors Ins. Co. v. Dorinco Reinsurance Co.*, 736 F.Supp. at 1266 (dismissing plaintiff's reformation claim based on unilateral mistake and noting that "plaintiff was represented by well-respected counsel" in the negotiations process); *South Fork Broadcasting Corp. v. Fenton*, 528 N.Y.S.2d at 839 (rejecting plaintiff's reformation claim based on unilateral mistake, in part, on the ground that "the negotiations had been conducted by sophisticated, counseled businessmen"); *Chimart Assocs. v. Paul*, 498 N.Y.S.2d at 347, 489 N.E.2d at 234 (same). Accordingly, the Court finds that Winmar's reformation claim, to the extent it relies on a theory of unilateral mistake, is inadequate as a matter of law.[15]

## II. The Real Estate Taxes Claim

■■■■ Teachers also moves, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment dismissing Winmar's Second Cause of Action to the extent it seeks reimbursement for real estate taxes paid by Winmar pursuant to the Agreement of Sale. According to Teachers, Winmar's obligations with respect to the payment of real estate taxes is firmly established in the Agreement of Sale and the Income Guaranty. The Court disagrees and finds that a genuine issue of material fact exists as to the method of calculating Winmar's liability.

Under the Income Guaranty, Net Operating Income was to be determined by subtracting from "Gross Rentals ... all operating expenses that are customary for first class office buildings in Milwaukee ... including ... (vii) [a]ll real estate and personal property taxes and assessments." *See* Income Guaranty, annexed to Teachers' Exhibits as Exh. "PX–1," at ¶ 1(a). Moreover, the Income Guaranty provided that all operating expenses, including real estate taxes, were to be computed "on the accrual basis of accounting." *Id.* Teachers maintains that the accrual accounting method required it to designate real estate taxes accrued in 1986, and therefore payable in 1987 under Milwaukee law, as an operating expense in calculating Net Operating Income for 1987. Further, Teachers argues that the accrual accounting method did not require that real estate taxes received from the Building's tenants in 1986 be included as Gross Rentals in that year's calculations. Teachers presents no evidence, however, in support of its contention that the accrual accounting method requires this result. In fact, the only evidence before the Court indicates that, in calculating the real estate tax expense in 1987, the accrual method required the inclusion as income of tenant real estate taxes received by the Building. *See* Olson Aff. at ¶¶ 7, 9–10. According to Larry L. Olson ("Olson"), a certified public accountant and Winmar executive, "[o]ne of the most fundamental principles of accrual accounting is the matching of income and expense."[16] *Id.* at ¶ 7. Therefore, according to Olson, "for purposes of the Income Guaranty, real estate taxes must be expensed in the year that they are paid." *Id.* at ¶ 10.

Teachers argues further that, even if Winmar's position on accrual accounting were accepted, the definition of Gross Rentals precludes the inclusion of any amounts received as income in 1987. As Gross Rentals includes only those amounts "paid or payable to [Teachers] under or with respect to Leases," Teachers claims that real estate tax receipts cannot be included as income under the terms of the Income Guaranty. In opposition, Winmar maintains that real estate taxes were recovered from tenants according to

---

15. As the Court finds that Winmar cannot demonstrate justifiable reliance, the Court need not reach the issue of whether Winmar has satisfied the other elements of fraudulent concealment.

16. Teachers argues that Olson's testimony should be disregarded on the ground that Winmar has not designated him an expert and Teachers has not had the opportunity to cross-examine him on his affidavit testimony. The Court finds these arguments to be without merit, however, as Teachers had sufficient opportunity to examine Olson's qualifications and challenge his views on the accrual accounting method during Olson's deposition. In any event, Teachers has presented no evidence of its own to challenge Winmar's interpretation of the accrual accounting method.

the lease agreements and are therefore properly included in calculating Gross Rentals. *See* Deposition of Paul E. Von Borstel, taken on 1/8/93, annexed to Winmar's Excerpts, at 429, 433. The Court finds the record to be unclear on this issue and that a triable issue of fact therefore exists as to the proper calculation of real estate taxes under the Income Guaranty. Accordingly, Teachers' motion for partial summary judgment dismissing Winmar's Second Cause of Action to the extent it seeks reimbursement for an overpayment of real estate taxes is denied.[17]

### CONCLUSION

For the reasons set forth above, Teachers' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure is denied except to the extent it seeks dismissal of that portion of Winmar's First Cause of Action based on unilateral mistake. The parties are directed to appear at a pre-trial conference on January 11, 1995 at 2:00 P.M.

SO ORDERED.

---

17. As the Court denies Teachers' motion to dismiss any of Winmar's Causes of Action, it need not address Teachers' motion for the recovery of reasonable attorney's fees pursuant to ¶¶ 3 and 12 of the Income Guaranty.