[673 NYS2d 369]

KEVIN D. SHEA et al., Respondents, v HAMBROS PLC et al., Appellants.

First Department, May 7, 1998

40

APPEARANCES OF COUNSEL

*Joel A. Kirsch* of counsel (*Thomas C. Morrison* and *Sheryl A. Stoessel* on the brief; *Patterson, Belknap, Webb & Tyler, L. L. P.,* attorneys), for respondents.

*John P. Stigi, III,* of counsel (*Alan R. Glickman* and *Antoinette Passanante* on the brief; *Schulte Roth & Zabel, L. L. P.,* attorneys), for appellants.

## OPINION OF THE COURT

MILONAS, J. P.

In 1983, plaintiff Kevin Shea and defendant N. Price Paschall formed an investment banking company. Albert Macchioni joined the business in 1985, after which it was known as Shea, Paschall & Macchioni, Inc. (SPM). The following year, SPM entered into an informal relationship with defendant Hambros PLC, a British holding company, and its American subsidiary, defendant Hambro America Inc. (HAI), pursuant to which SPM provided services to certain clients of these defendants. After several years, the parties decided to formalize their affiliation, and it is the series of agreements executed thereafter to this end and Shea's ultimate ouster from the business that form the basis of this appeal.

First, in March 1988, a purchase and operating agreement was executed among the following parties: HAI, SPM, Shea, Paschall, Macchioni, and SPM Associates, a partnership formed by SPM's three partners prior to executing the purchase agreement and the corporate plaintiff in this action. The terms of this purchase agreement provided for HAI to acquire 75 shares, or 50%, of SPM's stock, with each of the three partners individually holding 25 shares. The purchase price was $1 million, paid by a promissory note dated March 15, 1988 and due March 15, 1991; the note was executed by HAI, guaranteed by defendant Hambros Group Investments Ltd. (HGIL) and held by SPM Associates. The latter was also to hold a call option apparently provided for in the "SPM Stockholders Agreement," whereby, under certain circumstances, it could buy back HAI's 75 shares at "book value." The purchase and operating agreement expressly provided that if Shea "ceases to be a full-time

employee of [SPM]" before the maturity date for any reason other than his death, "then the Purchase Price shall be zero." A similar provision in the note stated that in the event that Shea was no longer employed by the company on the maturity date, the note's principal amount "shall be zero and no sum, whether as principal or accrued interest, shall be payable by [HAI] hereunder." The note also provided that the principal amount would be reduced by outstanding loans owed to HAI on the maturity date.

According to plaintiffs, the purpose of the provision linking Shea's employment with payment on the note was to discourage Shea from leaving the company within its first three years. Plaintiffs also contend that Shea agreed to the deal in reliance upon a private agreement between him and Paschall to the effect that neither would vote in any capacity against the other's interest.

One year after the execution of the 1988 purchase and operating agreement, a further reorganization took place, following SPM's acquisition of an investment banking concern in 1988 and in furtherance of the acquisition of a private placement financing group consisting of defendants Powell, Lazarus and Shaffer (the Powell Group). There was controversy as to whether SPM or Hambros would acquire the Powell Group, and, according to plaintiffs, and central to their complaint, this dissension led defendants to begin to contemplate taking control away from Shea and to conduct private negotiations with Paschall. Indeed, plaintiffs contend that the May 1989 reorganization, as described below, had Shea's ultimate removal as its goal.

The reorganization resulted in the following changes among the parties, including Macchioni's departure from SPM. SPM was renamed SPP Hambros, and SPP Inc. was created as a wholly owned subsidiary of SPP Hambros, which then transferred all its assets and liabilities to SPP Inc. In addition, a partnership named SPP Partners was formed by Shea, Paschall, Powell, Lazarus and Shaffer for the purpose of holding shares in SPP Hambros, which were allotted as follows: SPP Partners held 50 shares (25%); HAI held 100 shares (50%); and Shea and Paschall each held 25 shares (12.5%). The shares allotted to Shea and Paschall were in exchange for their respective 25 shares of SPM, and the SPP Partners' partnership agreement further provided that, "[u]pon execution of this Agreement, Shea and Paschall shall each contribute the 25 shares each owns in SPP Hambros to the capital of the Partner-

ship. Shea and Paschall each represent and warrant that upon the contribution of such Shares to the Partnership, the Partnership will have all right, title and interest in and to such Shares." Pursuant to the partnership agreement, therefore, SPP Partners was to hold a total of 100 shares (50 allotted directly to it and 50 contributed by Shea and Paschall as mandated), making it a 50% shareholder with HAI.

Under this reorganization and pursuant to the SPP Hambros shareholders' agreement, Shea was Chairman of the Board and Chief Executive Officer of both SPP Hambros and SPP Inc., while the board of directors of both new entities consisted of Shea, Paschall and Powell and three HAI corporate officers, defendants Goodman, Sporborg and Lewis. The various parties to the 1989 reorganization executed an overarching operating agreement that expressly permitted for the termination of employment of *any* principal of SPP Inc. and SPP Hambros, with or without cause, by vote of the board of directors. Each principal agreed to serve full time for a period of 10 years, "unless sooner terminated or extended." Under the operating agreement, five of the six named directors constituted a quorum, and the affirmative vote or written consent of five directors was "necessary for the transaction of any business of the Board of Directors." The partnership agreement governing SPP Partners provided that its five partners "shall endeavor to achieve unanimity with respect to Partnership decisions," but permitted action on agreement of "not less than 75% of the interest in the Partnership." By a "Side Letter of Agreement" dated May 16, 1989, the relevant parties terminated their 1988 SPM stockholders agreement and purchase and operating agreement. It is undisputed that the 1988 promissory note remained in full force and effect.

Following this reorganization, the relationship among the parties worsened. According to Paschall's deposition, he became so "completely uncomfortable with Mr. Shea's management" that he believed Shea should be terminated and so informed Powell in early 1990.

On February 26, 1990, a series of acts was taken resulting in Shea's removal. Four of the five partners of SPP Partners (i.e., all but Shea himself) signed an agreement authorizing Powell to act on behalf of SPP Partners as a 50% shareholder of SPP Hambros, "to effect the removal of Shea as a director of SPP Hambros." The interest in the company held by the four partners constituted the 75% required by the by-laws to take such action. Then, HAI and SPP Partners, each acting as a

50% shareholder of SPP Hambros, adopted a unanimous shareholders' consent removing Shea as director of SPP Hambros as of that date. Next, the five remaining directors of SPP Hambros (the necessary quorum) gave unanimous written consent to a resolution by which Shea was immediately terminated from all offices he held with SPP Hambros; by the same directors' consent, SPP Hambros, as sole shareholder of SPP Inc., approved his removal as a director of SPP Inc. also. Then, with said stockholder termination of Shea as director of that company, the remaining directors of SPP Inc. (the necessary quorum) executed a unanimous directors' consent terminating him as Chairman of the Board and Chief Executive Officer.

It is undisputed that, according to the records of SPP Hambros, Shea was a record shareholder of the company on February 26, 1990, despite the provision in the SPP Partners partnership agreement requiring him to turn over those shares to SPP Partners upon execution of that agreement.

When the 1988 promissory note matured on March 15, 1991, it was not paid. Both HAI and HGIL asserted that, pursuant to its express provisions, there was no obligation to pay the note because Shea was no longer a full-time employee and because outstanding loans owed to HAI far exceeded the amount of the note. On March 27, 1991, both SPP Hambros and SPP Inc. were dissolved, at which time, according to financial reports submitted by defendants on their summary judgment motion, the fair market value of each company was zero.

Plaintiffs thereafter instituted the instant lawsuit setting forth 10 causes of action. The complaint alleged fraudulent inducement in connection with the reorganization agreements; breach of employment agreement; breach of fiduciary duty by Paschall; and tortious interference with Shea's employment agreement. The complaint also sought a declaratory judgment that Shea's dismissals were void under corporate by-laws and State law; dissolution of SPP Hambros and SPP Inc. or fair value for Shea's shares thereof; payment under the promissory note by HAI or its guarantor; and payment of certain fees and bonuses allegedly due under both the 1988 and 1989 agreements.

Defendants moved to dismiss the complaint for failure to state a cause of action and plead fraud with sufficient particularity; in the alternative, defendants sought summary judgment dismissing the complaint. By order entered July 23, 1992

(not the decision on appeal before us), the IAS Court then assigned to the matter denied summary judgment as premature but granted the motion to dismiss in three respects: first, it dismissed the claims asserted by Shea individually as to payment on the promissory note (in the sixth and seventh causes of action); second, it dismissed as against defendants Paschall and Powell the claim for tortious interference with contract (in the ninth cause of action); and third, it dismissed the cause of action for breach of fiduciary duty to the extent that it alleged a breach of an oral agreement (in the eighth cause of action). The question of personal jurisdiction as to defendant Hambros PLC, raised by separate motion, was referred to a Special Referee, and jurisdiction was later conceded. Thus, while portions of certain causes of action were dismissed, all 10 survived at least in part.

Both sides appealed this decision, although defendants later withdrew their appeal. By order entered January 6, 1994, this Court affirmed the decision of the IAS Court (200 AD2d 371).

Thereafter, defendants answered the complaint, and some discovery was held until April 1994, when plaintiffs moved for partial summary judgment on the first, second and fourth causes of action. Defendants cross-moved for summary judgment to dismiss the first through fourth, sixth and seventh causes of action. The IAS Court concluded that neither side had demonstrated entitlement to summary judgment. Among other issues, the court noted particularly those regarding fraudulent inducement and Shea's obligation to turn over his shares to SPP Partners.

Defendants appealed and plaintiffs cross-appealed from this order. Plaintiffs later withdrew their cross appeal, and we now have before us only defendants' appeal from the denial of their motion for summary judgment. Because the fraud alleged is, according to plaintiffs, related to other claims as well, and the IAS Court found that the issue of fraud must be resolved prior to addressing other claims, we turn first to the cause of action for fraudulent inducement.

### The Third Cause of Action for Fraudulent Inducement

The substance of plaintiffs' cause of action for fraudulent inducement is that defendants made affirmative misrepresentations as well as failed to make necessary disclosures to Shea in connection with the negotiations among the various parties leading up to the 1989 reorganization. The alleged misrepresentation and nondisclosure are fundamentally one and the

same: that while the stated purpose of the reorganization was to enable SPM to acquire the Powell Group (an idea proposed by Shea himself), defendants' actual, undisclosed intent behind the reorganization was to oust Shea by exercising certain provisions adopted in the reorganization agreements, thus avoiding payment under the 1988 promissory note and—mentioned for the first time in plaintiffs' brief—acquiring the Powell Group for themselves. It is plaintiffs' position that defendants reorganized the existing companies and created new ones whose by-laws would permit the series of steps later taken to remove Shea with that express purpose in mind, while Shea entered into the agreements in reliance on the alleged stated purpose cited above.

In order to sustain a cause of action for fraudulent inducement, plaintiffs must show "misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury" (*Lama Holding Co. v Smith Barney*, 88 NY2d 413, 421; *Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403; *Century 21 v Woolworth Co.*, 181 AD2d 620, 625). Such a claim, like any fraud cause of action, must set forth "the circumstances constituting the wrong * * * in detail" (CPLR 3016 [b]; *Megaris Furs v Gimbel Bros.*, 172 AD2d 209, 210). Plaintiffs have submitted extensive argument that they have sufficiently demonstrated the requisite elements, but we find, upon our examination of the record, that the allegations are no more than conclusory statements and fail to establish the necessary elements of this claim. Of course, if sufficient factual allegations of even a single element are lacking, then the cause of action must be dismissed (*supra*). The essence of plaintiffs' claim is that, given Shea's removal nine months after the reorganization, this must have been defendants' intent all along, and the only reason they pursued the 1989 agreements. Rather than support an alleged conspiracy to this effect, however, the record reveals an arm's length transaction among experienced businesspeople angling over the terms of a prospective acquisition, each attempting to get the most out of the deal and protect their respective interests.

In particular, we find the element of reliance conspicuously absent. To show reliance, Shea must demonstrate that he was induced to " 'act [or] refrain from acting' " to his detriment by virtue of the alleged misrepresentation or omission (*Megaris*

*Furs v Gimbel Bros.*, *supra*, at 212). By his own account, Shea was a sophisticated businessman, whose contribution to the initial partnership with Paschall was his business acumen (with Paschall contributing the capital); throughout the record are his assertions that the success of his companies was due primarily, if not exclusively, to his efforts. Given what Shea concedes was the sharply "acrimonious" nature of the negotiations, to the degree that they were "almost broken off," and the dissension among the parties, he can hardly claim with any credibility that he, a savvy businessman, entered into the resulting agreements lulled by faith or trust in the parties across the bargaining table, or that he unwittingly gave up some valued right in the bargain (*see, e.g., Mobil Oil Corp. v Joshi*, 202 AD2d 318).

The allegation of trust and reliance is also fatally undermined and contradicted by Shea's own account that, prior to finally reaching agreement, various defendants went so far as to try to persuade him to terminate his partners, Paschall and/or Macchioni (the latter was in fact terminated pursuant to these efforts). Thus, while the parties were not strangers to each other, the agreements were reached in a climate of discord and dissension among parties with legal counsel. Shea himself selected the attorney who represented SPM throughout, and if he did not secure separate representation for himself, as plaintiffs now point out, that was his choice.

Plaintiffs cite *Heineman v S & S Mach. Corp.* (750 F Supp 1179 [ED NY]) to support their claim of fraudulent inducement, in particular with respect to defendants' alleged failure to disclose their true intent in pursuing the reorganization agreements. In *Heineman*, however, plaintiff submitted probative evidence of numerous misrepresentations, on which he had relied, supporting his claim that defendants had failed to disclose their true intent at the time of the parties' underlying agreement. Such probative evidence is absent here. In this connection, we note too that, while fraudulent intent in particular is often a question of fact, we find that even as to this element, plaintiffs have failed to submit evidence tending to support such intent (*see, National Union Fire Ins. Co. v Allen*, 232 AD2d 80, 86).

That Shea's expectations for the business under the reorganization may not have been realized, or that he was disappointed in the bargain, does not transform his fundamental claim for breach of contract (the fifth cause of action, as to which neither side moved for summary judgment on the mo-

tion before us or on the previous one) into one for fraud. Nor does the mere fact of his removal a little less than a year after the agreements were reached tend to establish plaintiffs' claim that defendants must have harbored this intent all along. That is, the fact that defendants exercised an option expressly provided for in the parties' written agreements—and equally applicable to "any principal"—does not suggest deceit in the adoption of those provisions.

Having relied upon the allegations set forth in the complaint and unsworn correspondence in opposition to defendants' motion, plaintiffs also attempt to avoid summary judgment by citing their need for further discovery on this particular cause of action. In this regard, however, they have done no more than claim that further discovery would "likely result in" evidence of defendants' fraudulent intent, speculation that is inadequate to defeat summary judgment (see, Rogan v Giannotto, 151 AD2d 655, 656). Accordingly, as to this cause of action, we conclude that there is simply no genuine issue of material fact to be resolved, and summary judgment dismissing this claim should have been granted.

### The First and Second Causes of Action for Declaratory Judgment

The first and second causes of action seek a declaratory judgment that Shea's removal as officer and director of SPP Hambros and SPP Inc. was unlawful under the corporations' bylaws and State law. As previously described, Shea's removal was effected by a series of acts taken by the various business entities in this litigation. First, SPP Partners and HAI, in their presumed capacity as sole shareholders of SPP Hambros, by written consent unanimously terminated Shea as director of SPP Hambros. Although at the time of that consent Shea was still a partner in SPP Partners, its partnership agreement, as noted, permitted SPP Partners to act by decision of 75% interest of the partnership. Since all the directors except for Shea himself (who held 25% interest) were in agreement as to the shareholder consent, SPP Partners was entitled to take this action.

The validity of the shareholders' consent adopted by SPP Partners and HAI together, however, depends on whether the two were in fact the sole shareholders in SPP Hambros. Under New York law, shareholders may execute such a written consent rather than hold a shareholders' meeting if the written consent is unanimous (Business Corporation Law § 615). There

is a similar provision to this effect in the SPP Hambros by-laws. Plaintiffs claim that the SPP Hambros shareholders' consent adopted only by SPP Partners and HAI was not in fact unanimous because Shea himself was a shareholder of SPP Hambros at the time and had not agreed to such action. Thus, they argue, the SPP Hambros shareholders' consent was invalid and all the successive acts were therefore invalid as well. Because we find that, as to this threshold question of the unanimity of the shareholders' consent, there is an issue of fact, and because, notwithstanding the apparent validity of the successive corporate acts, they are premised on this first act, neither side was entitled to summary judgment as to these causes of action.

As explained previously, when SPM was renamed SPP Hambros, 100 shares of the "new" entity, constituting 50% of the stock, were allotted to HAI, while SPP Partners (consisting of Shea, Paschall, Powell, Lazarus and Shaffer) held 50 shares, or 25%. Shea and Paschall individually were given 25 shares each (12.5%) in exchange for their respective 25 shares of SPM, but the terms of the new partnership agreement required them to contribute those shares immediately—"upon the execution of [the SPP Partnership] agreement"—to the partnership's capital. Thus, from the outset of the reorganization, i.e., as of May 17, 1989, SPP Partners was supposed to be a 50% shareholder of SPP Hambros along with HAI. The question is whether such contribution ever occurred.

It is undisputed that on February 26, 1990, the date of the corporate acts in question and Shea's removal, the books and records of SPP Hambros reflect that Shea was still a shareholder of 25 shares. If he was in fact still a shareholder, then SPP Partners could not vote as a 50% shareholder of SPP Hambros, and there could be no written consent under SPP Hambros by-laws and State law without Shea's vote to make it unanimous. That Shea may have failed or refused to turn over the shares may well be a breach of the partnership agreement requiring him to do so, but it does not change the fact that, according to the documentary evidence submitted by plaintiffs, he was a shareholder on the day SPP Partners purported to act as owner of his shares. Curiously, it is unclear from the record, and even the parties' arguments, why such transfer or contribution may not have occurred. In any event, defendants argue that the books and records of the company should be overlooked in favor of the partnership agreement, which expressly required the transfer and plainly intended that SPP

Partners would immediately become a 50% shareholder of SPP Hambros.

Contrary to defendants' arguments, the validity of the shareholders' consent cannot be determined on this record. We note in particular that, despite defendants' assertion that the rights to the shares should be viewed as having vested in SPP Partners with the performance of all conditions necessary— merely the execution of the partnership agreement—for the transfer of shares (*see, e.g., Serdaroglu v Serdaroglu*, 209 AD2d 600, 602-603), the partnership agreement expressly provides not only that Shea and Paschall "shall contribute" their shares to the partnership but also that "*upon the contribution* of such Shares to the Partnership, the Partnership will have all right, title and interest in and to such Shares" (emphasis added). By its own terms, then, the agreement seems to condition the Partnership's acquisition of rights and interests in the shares upon the actual act of contribution. As the parties dispute whether this contribution ever took place, and since it cannot be discerned from the record whether it did or why it did not, and since, as noted, the validity of the successive acts depends on this initial act, there is a question of fact as to this issue and summary judgment was properly denied as to both sides.

### The Sixth and Seventh Causes of Action for
### Payment on the 1988 Promissory Note

HAI and HGIL moved for summary judgment dismissing the causes of action seeking payment under the 1988 promissory note on the ground that, according to the terms of the note, the amount due was "zero" because Shea had ceased to be a full-time employee prior to the maturity date of March 15, 1991. Defendants also invoke the provision of the note whereby outstanding loans made by HAI would reduce the principal amount due at maturity. According to HAI's financial statements, SPP Hambros owed HAI over $4 million in unpaid loans as of March 1991; thus, for that reason as well, HAI and HGIL assert they are not obligated to pay.

The promissory note provides as follows:

"1. *Principal Amount.* The Principal Amount shall be subject to reductions as follows:

"(a) If Kevin D. Shea ceases to be a full-time employee of Shea, Paschall & Macchioni, Inc., a New York corporation (the 'Corporation') before the third anniversary hereof for any reason other than his death prior to such date, the Principal

Amount shall be zero and no sum, whether as principal or accrued interest, shall be payable by the Maker hereunder."

Pursuant to subdivision (b), the same result will obtain if, unless by reason of death, *both* Paschall and Macchioni are no longer full-time employees on the maturity date.

The 1988 purchase and operating agreement contains corresponding language. Section 2, "Purchase of Stock," subdivision (b), of that agreement provides: "The 'Purchase Price' shall mean $1,000,000 less the sum of (i) the Outstanding Loan Balance (as defined below) and (ii) the Departure Deduction Amount (as defined below); *provided, however,* that if for any reason other than his death prior to the third anniversary of the Closing, Kevin D. Shea ceases to be a full-time employee of the Corporation on or before such date, or if neither N. Price Paschall nor Albert J. Macchioni is a full-time employee of the Corporation on the third anniversary of the Closing for any reason other than the deaths of both such individuals prior to such date, then the Purchase Price shall be zero." (Emphasis in original.) The "Departure Deduction Amount," the sum of $200,000, is to apply only if *either* Paschall or Macchioni is not a full-time employee on the maturity date and has not been acceptably replaced, according to the terms of both the agreement and the note.

In addition to these express provisions regarding the amount due on the maturity date, the "Employment" section of the 1988 purchase and operating agreement provides that each principal (Shea, Paschall, Macchioni) agrees that he "shall serve as a full-time employee of the Corporation" until the third anniversary of the agreement (i.e., the date the promissory note matures) for specified compensation. There is no provision in the 1988 note or agreement regarding the termination of a principal.

By their "Side Letter of Agreement" of May 16, 1989, the parties expressly terminated the 1988 purchase and operating agreement. While the note specifies the continued employment of the three SPM principals as a condition of payment, only the purchase and operating agreement includes the three-year commitment of service. The 1989 agreements, however, specify that *any* principal may be terminated with or without cause. Nine months after the 1989 agreements were executed, Shea was terminated without cause.

Plaintiffs opposed defendants' summary judgment motion on the ground that the disputed language of the note and 1988 agreement was not intended to encompass Shea's involuntary

termination. They urge the court to look to the language of the documents in their entirety and the circumstances in which the documents were executed in order to ascertain the true meaning of the note's provision. In particular, plaintiffs point to the 1988 agreement, in which Shea agreed to serve for three years and which, according to plaintiffs, does not allow defendants to terminate Shea without cause. It is only through the 1989 agreements that defendants acquired the ability to terminate Shea without cause, and, as previously discussed, plaintiffs assert that his assent to these agreements was procured by fraud. At the very least, they maintain, the 1989 agreements are inconsistent with the 1988 agreements, and parol evidence is therefore necessary, mandating denial of summary judgment. Finally, they claim that, even if the provision did encompass involuntary termination, it may not be invoked because Shea's removal was engineered through fraud, both with respect to the right to terminate him without cause (the fraudulent inducement claim) and the actual act of removal (beginning with the shareholders' consent, discussed *supra*).

■ We have already addressed plaintiffs' fraud claim and concluded that summary judgment should have been granted dismissing their cause of action for fraudulent inducement. However, while the language of the disputed provisions of the note and 1988 purchase and operating agreement appears to be clear and unambiguous, and defendants' right to terminate Shea without cause would appear to be confirmed by provisions in documents executed contemporaneously (e.g., the 1988 SPM Associates agreement) and subsequently (notably the "Side Letter of Agreement" of May 16, 1989), we find that defendants' motion for summary judgment dismissing these causes of action was nonetheless properly denied in light of our conclusion, *supra*, that the validity of the initial act in the sequence of acts culminating in Shea's removal from the various corporate entities cannot be determined on this motion for summary judgment.

### The Fourth Cause of Action for Judicial Dissolution or Fair Market Value

■ Defendants seek summary judgment dismissing this claim on the ground that Shea lacks standing to seek judicial dissolution and that the issue is, in any event, moot. The threshold requirement for judicial dissolution is that the shareholder seeking dissolution hold at least 20% of the

company's stock (Business Corporation Law § 1104-a). While we have concluded, *supra*, that there is a material question of fact with respect to Shea's status as shareholder of SPP Hambros, Shea was to hold only a 12.5% interest in the company, i.e., 25 out of 200 shares; however, the record includes certificates (including Shea's) representing only 125 outstanding shares. Defendants contend that the failure to record the remaining 75 shares issued to HAI and SPP Partners does not affect the percentage of shares allotted to Shea insofar as this claim is concerned. We find that, given the state of the record before us and the threshold question of Shea's status as a shareholder, which affects the claim for dissolution or fair market value, defendants are not entitled to summary judgment on this cause of action.

While defendants also argue that plaintiffs' claim is moot, given that the companies were dissolved by act of their board of directors, and that, in any event, plaintiffs failed to submit evidence contradicting defendants' financial reports purporting to show that the fair value of SPP Hambros and SPP Inc. was zero at the time of dissolution, the validity of the boards' actions hinges on Shea's status as shareholder. Thus, although the IAS Court did not address this cause of action specifically in its decision, we find, for the reasons just stated, that summary judgment was properly denied as to this particular claim.

Accordingly, the order of Supreme Court, New York County (Herman Cahn, J.), entered September 25, 1995, which, insofar as appealed from by defendants, denied their motion for summary judgment dismissing the first through fourth, sixth and seventh causes of action, should be modified, on the law, to grant the motion as to the third cause of action for fraudulent inducement, and otherwise affirmed, without costs.

WALLACH, WILLIAMS, TOM and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered September 25, 1995, modified, on the law, to grant defendants' motion to dismiss the third cause of action for fraudulent inducement, and otherwise affirmed, without costs.