■ TRINITY ASSOCIATES, INC., Respondent, v TELESECTOR RESOURCES GROUP, INC., Doing Business as VERIZON SERVICES GROUP, INC., Appellant. [831 NYS2d 390]—

Order, Supreme Court, New York County (Richard B. Lowe, III, J.), entered January 10, 2006, which, to the extent appealed from, denied defendant's motion for partial summary judgment, affirmed, without costs.

Plaintiff, a supplier of electrical power testing and troubleshooting services, entered into an as-ordered maintenance and testing work agreement with defendant that authorized the latter to modify the scope of the work or cancel the contract. After plaintiff had performed under the agreement for a period of time, defendant, instead of choosing to modify the scope of the work or terminate the contract, purported simply to suspend the service "indefinitely," advising plaintiff that it would continue to request repair services on an "as needed" basis and asked plaintiff to "let us know" if "there is a cost associated with retaining this service." Plaintiff responded with a cost quotation for the anticipated services. Defendant expressed no objection, and proceeded to order and utilize such services. When the parties were thereafter unable to agree over payment, plaintiff commenced this action for breach of contract, inter

alia. Defendant moved for partial summary judgment to limit the amount of damages recoverable on the breach of contract cause of action, and to dismiss the remaining claims in the complaint.

It is undisputed that defendant never expressly cancelled the contract and, instead, simply purported to hold plaintiff's services in suspense, even though there was no language in the contract to that effect. Thus, the Commercial Division correctly found triable issues of fact concerning defendant's right to suspend plaintiff's services, whether such suspension constituted a modification or cancellation of the contract, and whether plaintiff was acting under the terms of the agreement or some new arrangement when it continued to perform emergency services for defendant. We have considered defendant's remaining contentions and find them unavailing. Concur—Andrias, J.P., Gonzalez and Sweeny, JJ.

Marlow and Catterson, JJ., concur in a separate memorandum by Catterson, J., as follows: I write separately since I agree with the result but for substantially different reasons. Upon the plain reading of the agreement, as urged on us by the defendant, Telesector Resources Group, doing business as Verizon Services (hereinafter referred to as Verizon), I do not see any issues of fact arising out of Verizon's "suspending" of plaintiff Trinity Associates' (hereinafter referred to as Trinity) maintenance and testing work. I believe the "suspension" fell strictly within Verizon's contractual right under the modification provision of the agreement. Nevertheless, its motion to limit damages to those arising out of a failure to give 10 days' notice under that provision was rightly denied. In my view, plaintiff's assertion that Verizon additionally failed to comply with the modification provision because it did not compensate Trinity at its "required price" for the modification after accepting the price raises a genuine issue of material fact that precludes granting partial summary judgment to the defendant.

Trinity, a supplier of electrical power testing and troubleshooting services, entered into a switchgear equipment maintenance and testing work contract with Verizon's predecessor, Bell Atlantic. The services that Trinity contracted to provide were contained in a 19-page appendix referred to as the "scope of work." The appendix detailed Trinity's obligation to perform regular tests and maintenance on all installed electrical switchgear systems and devices. A schedule for the maintenance and testing work was developed with Verizon, and Trinity embarked on a contract that involved daily inspection visits to numerous Verizon facilities spread over a three-state area consisting of Pennsylvania, Delaware, Maryland.

The appendix included a description of Trinity's additional obligations such as developing and maintaining an emergency and repair dispatch and tracking service on a 365-day-per-year, 24-hour-per-day response basis to accept reports of switchgear system failures or problems. The repair dispatch and tracking service was required, inter alia, to dispatch switchgear repair technicians and issue follow up incident reports.

The agreement, however, made clear that Verizon was not obligated to purchase repair or replacement or overhaul services from Trinity but could solicit bids for the work. Verizon reserved the right to solicit competitive bids for any and all repairs, overhauls and replacements.

The first section of the contract provided that it was an "as-ordered" agreement. The agreement stated that the defendant was "not promising to purchase any quantity of Services from Supplier." In addition, the contract gave Verizon a right to cancel all or part of a purchase order prior to Trinity's completion of the services. It also authorized Verizon to modify the scope of the work on the basis of 10 days' notice to Trinity. The contract stated that Trinity was responsible for its own overhead, equipment, tools, transportation, materials and any costs of any nature, unless otherwise provided by the agreement.

After Trinity performed under the agreement from November 2000 to January 2001, Verizon *suspended* the terms of the agreement "indefinitely." In a letter dated January 22, 2001, Verizon stated:

"All services which have been authorized to be performed under this Agreement are hereby suspended indefinitely as a result of budget reductions . . . . Verizon may continue to request repair services on an 'as needed' basis. Additionally, Verizon would like to retain the emergency repair service and response time as per the specifications. If there is a cost associated with this service, please let us know. . . .

"All other Terms and Conditions of the AGREEMENT are reaffirmed and remain in effect to the extent that they do not conflict with the notification herein."

The plaintiff responded on February 14, 2001, in a letter from its president, Alan Loch, with a cost quotation for the emergency repair and response service of $291,782 per year plus job expense. Verizon did not respond to the price request in any written or verbal communication but proceeded to order emergency services from Trinity. When the parties were thereafter unable to agree over payment, Trinity commenced this action for, inter alia, breach of contract.

Following discovery, Verizon moved for partial summary judgment to limit the amount of damages recoverable on the breach of contract cause of action, and to dismiss the remaining claims in the complaint. Verizon asserted that, under the circumstances, the contract could have been breached only by a failure to give plaintiff the required 10 days' notice, and so plaintiff's damages should be limited to the loss of 10 days' work, calculated to be $8,972.

Trinity opposed and cross-moved for partial summary judgment on its breach of contract cause of action asserting that a suspension was neither cancellation nor termination, and so was not permitted under the contract. Trinity further asserted that suspension unlike cancellation or termination meant incurring substantial expense because suspension left the company in limbo, having to maintain a state of readiness in equipment and personnel to resume full work and maintenance schedules whenever Verizon requested. In its cross motion, plaintiff, for the first time, raised the issue of damages arising out of its provision of the emergency repair services.

The motion court denied Verizon's motion for partial summary judgment finding that triable issues of fact existed as to whether the suspension was a permissible action under the terms of the contract, and whether Trinity was acting under the terms of the agreement or some new arrangement when it continued to perform emergency repair services for Verizon. The court therefore also denied plaintiff's cross motion for partial summary judgment but allowed plaintiff to serve and file an amended complaint alleging that emergency service work had been provided without adequate compensation. On appeal, Verizon maintains that the suspension was a permissible modification of Trinity's scope of work, and that since its letter specifically reaffirmed all other terms and conditions of the agreement, therefore its damages should be limited to the failure to provide 10 days' notice.[1]

In my view, Verizon correctly maintains that it was within its contractual right to suspend the maintenance and testing part of Trinity's obligations. The agreement could not be plainer that, Verizon, by suspending the testing and maintenance work while expressing a desire to *continue* the "as needed" repair service according to the emergency repair and response times specified in the original agreement, modified the scope of the work, thus exercising a right it had preserved under the agreement.

---

1. Trinity did not cross-appeal the denial of its motion for partial summary judgment.

Indisputably, it was an extremely severe modification of the scope of work, essentially eviscerating the agreement from the point of view of the plaintiff, which had expended considerable assets to create an infrastructure to support the contract.[2] But, in my view that is not an argument that should aid this ostensibly business savvy plaintiff. (*See Shea v Hambros*, 244 AD2d 39, 47 [1st Dept 1998]; *see also Macrae v Dolce*, 249 AD2d 476, 477 [2d Dept 1998].)

Rather, I believe that having characterized the suspension as a modification, Verizon should not be able to pick and choose the part of the modification clause to which it wishes to adhere. The modification of the scope of work provision states in pertinent part: "[Verizon] may, upon ten (10) days prior written notice, modify a Scope of Work. Unless Supplier notifies [Verizon] to the contrary within five (5) days, Supplier shall perform the Services under the new Scope of Work at the same prices or no greater than Supplier would have charged to perform the Services under the old Scope of Work. [Verizon] will include any proposed price decrease with its Notice. If Supplier is not willing to perform the Services under the new Scope of Work at the same (or lower) price Supplier shall, within five (5) days of its receipt of notice of the new Scope of Work, inform [Verizon] in writing of Supplier's required price."[3]

Indeed, Trinity responded to Verizon by letter in which Trinity's president detailed his reasons for quoting a new price for the provision of the modified services. On February 14, 2001, he wrote: "As far as Verizon wanting to retain the emergency repair service and response time as per the specifications, the AGREEMENT is a package. Each part of the AGREEMENT supports the other. . . . When tests are done, problems are identified and repaired so they don't develop into emergency shutdowns. . . . When two of the four parts of the contract aren't done as is the case in this contract, the contract can't be accomplished as bid."[4]

After calculating the required price of maintaining the emer-

---

**2.** According to deposition testimony, Verizon executives were aware of the extremely negative impact such a suspension would have on Trinity's business and considered the possibility of a lawsuit brought against them by Trinity.

**3.** Verizon's letter suspending the maintenance and testing work essentially also invited Trinity to respond by giving Verizon the cost of the modified scope of work.

**4.** The provisions detailed in the scope of work appendix appear to support the assertion that the emergency repair and response service was never contemplated as a stand-alone service but was interdependent on the maintenance and testing work provided by Trinity. For example, section 1.9 states: "The awardee shall not be responsible for the labor, materials or supplies to

gency repair service and response times at a total of $291,782 per year plus job expenses, he further wrote: "You might ask why so much when we weren't charging you anything for this service in the contract. Well, we were indirectly charging you, by charging $700,000 or so a year for testing . . . coordination studies and infrared surveys. The way it was supposed to work out . . . was that field engineers should have either been gathering data or doing . . . studies all day long in the office or field and, thus, available to answer emergency calls within the prescribed limits."

What happened next conformed somewhat less stringently to that modification provision which required that: "Upon receipt of that notice [Verizon] may at its option: (a) accept Supplier's price; (b) retract the new Scope of Work; or (c) terminate the Agreement upon ten (10) days' notice."

It is undisputed, however, that Verizon without responding to Trinity's requested price, continued to order the repair services over the next few years. Thus, upon plain reading of the agreement, a finder of fact could in this case reasonably determine that since Verizon did not retract the new scope of work, or terminate the agreement, Verizon accepted Trinity's requested price. Such a determination may find further support in the fact that the modification provision does not specify that acceptance had to be in writing or even how acceptance was to be communicated if not by continuing to utilize and order services under the modified scope of work.

In my view, Trinity's argument that Verizon's silence may be deemed acceptance is persuasive, and is supported by decisions of this Court. (*See Club Chain of Manhattan v Christopher & Seventh Gourmet*, 74 AD2d 277, 284 [1980], *appeal dismissed* 53 NY2d 703 [1981]; *see also John William Costello Assoc. v Standard Metals Corp.*, 99 AD2d 227, 231 [1984], *appeal dismissed* 62 NY2d 942 [1984].)

In any event, I believe Trinity correctly asserts that issues of fact exist arising out of the parties' correspondence and Verizon's subsequent silence, and that these preclude granting Verizon partial summary judgment limiting the damages recoverable by Trinity.

---

perform repairs which are not normally considered to be maintenance items (i.e.—replacing control fuses, indicating lamps, etc.), unless the need for said repairs was caused by the negligence of the awardee . . . ."