(August 26, 2008)

■ TRINITY ASSOCIATES, INC., Respondent, v TELESECTOR RESOURCES GROUP, INC., Doing Business as VERIZON SERVICES GROUP, INC., Appellant. [863 NYS2d 186]—

Judgment, Supreme Court, New York County (Richard B. Lowe, III, J.), entered May 24, 2007, awarding plaintiff the principal sum of $1,251,895, and bringing up for review an order, same court and Justice, entered May 10, 2007, to the extent it denied in part defendant's motion to set aside the jury's verdict, affirmed, with costs. Appeal from the order dismissed, without costs, as subsumed in the appeal from the judgment.

Defendant contends that as a matter of law, it was permitted

to suspend the parties' contract, and plaintiff's February 14, 2001 letter could not have modified the contract because it was not signed by both parties. Both of these arguments were raised unsuccessfully in a prior appeal (38 AD3d 282 [2007]), and thus will not be entertained on this appeal (*see Sharp v Stavisky*, 242 AD2d 447 [1997], *lv dismissed* 91 NY2d 956 [1998]).

In order to overturn the jury's verdict as based on insufficient evidence, we would have to find that it was "utterly irrational" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). At trial, evidence was presented that defendant had sent plaintiff a letter on January 22, 2001, stating it wanted to retain the emergency repair services provided by plaintiff, and "If there is a cost associated with retaining this service please let us know." Plaintiff responded on February 14, 2001, that the total cost would be "$291,782 plus job expense per year." Defendant then utilized plaintiff's continuing emergency services without interposing any objection to the price quoted.

The jury could have reasoned that plaintiff's February 14, 2001 letter set forth its yearly fee, and that defendant accepted this offer without objection and subsequently ordered continuation of plaintiff's emergency services (*see John William Costello Assoc. v Standard Metals Corp.*, 99 AD2d 227, 231 [1984], *appeal dismissed* 62 NY2d 942 [1984]). Furthermore, the jury could have reasonably calculated its verdict on damages, based on the price quoted plus annual job expense, which would be consistent with the period alleged of breach, four years and 106 days.

We have considered defendant's remaining arguments and find them unavailing. Concur—Lippman, P.J., Nardelli and Acosta, JJ.

Friedman and Williams, JJ., dissent in a memorandum by Friedman, J., as follows: For the following reasons, I believe that the motions by defendant Telesector Resources Group, Inc. doing business as Verizon Services Group, Inc. (Verizon) for a directed verdict, and for judgment notwithstanding the verdict, should have been granted insofar as such motions were addressed to the only claim at issue on this appeal, namely, the second cause of action (characterized as "Breach of Subsequent Agreement") set forth in the amended complaint. Accordingly, I would reverse the judgment in favor of plaintiff Trinity Associates, Inc. (Trinity), grant the aforementioned motions, and dismiss the amended complaint. I therefore respectfully dissent from the affirmance of the judgment.

As noted in the decision rendered on the prior appeal in this case, Trinity, "a supplier of electrical power testing and

troubleshooting services, entered into an as-ordered mainte-
nance and testing work agreement with [Verizon] that autho-
rized the latter to modify the scope of the work or cancel the
contract" (38 AD3d 282, 282 [2007]). To reiterate, the agree-
ment, which was executed in 1999, was for services to be
provided on an "as-ordered" basis over a prescribed period of
time, which, as amended in 2000, was set to terminate on May
31, 2005. Section 1.1 of the 1999 agreement specifically provided
that this was "an 'as-ordered' agreement which means that it
covers Services as they are ordered by [Verizon]," and that
Verizon "is not promising to purchase any quantity of Services
from [Trinity]." Further, section 7.3 of the 1999 agreement
provided that Verizon would not pay anything in addition to the
specified service rate to cover Trinity's overhead expenses: "The
prices specified in this Agreement are the total prices and there
shall be no other charges whatsoever. Unless otherwise speci-
fied, the prices set forth in this Agreement or in a [purchase or-
der] include all incidental costs, including transportation,
entertainment and the use of all necessary tools, products and
equipment. . . . [Trinity] is responsible for all of [Trinity's] own
overhead, equipment, tools, telephone calls, transportation,
materials and any costs of any nature unless this Agreement
specifically provides otherwise."

By letter dated January 22, 2001, Verizon notified Trinity
that, due to "budget reductions," Verizon was "suspend[ing]
indefinitely" all services previously authorized under the 1999
agreement. The letter further stated: "Verizon would like to
retain the emergency repair service and response time as per
the [1999 agreement's] specifications. If there is a cost associ-
ated with retaining this service please let us know."

In response, Trinity sent Verizon a letter, dated February 14,
2001, which, for the most part, complained about Verizon's fail-
ure to order all the services Trinity had contemplated. The let-
ter also noted: "You asked me to think about the cost of provid-
ing emergency service. . . . [T]he total price for emergency
response is $291,782 plus job expense per year." The annual
figure of $291,782 was based on a rather slapdash estimate of
the labor cost of keeping electricians available to respond to
Verizon's emergency needs.

Verizon did not respond to Trinity's February 14, 2001 letter,
but did continue to order emergency services thereafter, for
which Trinity billed at the rates set forth in the 1999 agree-
ment. In 2002, the parties executed a written amendment of the
1999 agreement, raising the base hourly rate for services under
the contract by 50%, from $60 to $90. As Trinity's principal

admitted at trial, Verizon paid all of Trinity's invoices, but Trinity never sent Verizon a single invoice for payment of an annual fee of $291,782 for holding itself ready to provide emergency services.

Ultimately, the parties' relationship broke down, leading to the commencement of this action in 2003. In its amended complaint, Trinity asserted a cause of action for breach of the 1999 agreement, and a separate cause of action for breach of "a new agreement" allegedly formed by the parties' aforementioned "2001 exchange of correspondence," under which Verizon allegedly agreed to pay Trinity an annual fee of $291,782 to compensate Trinity for the costs of holding itself ready to provide emergency services. In this Court's prior decision affirming the denial of Verizon's pretrial motion for partial summary judgment, we held that issues of fact existed as to whether Verizon had a "right to suspend [Trinity's] services, whether such suspension constituted a modification or cancellation of the contract, and whether [Trinity] was acting under the terms of the [1999] agreement or some new arrangement when it continued to perform emergency services for [Verizon]" after the suspension (38 AD3d at 283).

The case was tried before a jury, and resulted in a verdict finding Verizon liable for breach of both the 1999 agreement (the first cause of action) and the alleged 2001 modification thereof (the second cause of action). The jury's award to Trinity comprised two components: (1) lost-profit damages of $92,500 for the breach of the 1999 agreement; and (2) $1,251,895 for the breach of the alleged 2001 modification. The latter component of the award represented an approximation of the result of multiplying the $291,782 annual figure in Trinity's February 14, 2001 letter by the approximately 4.3 years that remained, as of February 14, 2001, on the term of the 1999 agreement (which, again, was set to expire on May 31, 2005). Although the award on the second cause of action is based on the $291,782 annual figure in the February 14, 2001 letter, which was based on Trinity's estimate of the yearly labor costs of staying ready to provide emergency services to Verizon, at trial Trinity claimed only to have incurred $338,601.84 over a five-year period— somewhat less than $70,000 annually—on all expenses required to maintain readiness to perform all parts of the agreement with Verizon (not just emergency services).*

After trial, the court granted Verizon's motion for judgment

---

* It is also noteworthy that the amended complaint's ad damnum clause requested compensatory damages only "in the amount of not less than $700,000.00," and Trinity never moved to conform the pleadings to the proof.

notwithstanding the verdict solely to the extent of setting aside the jury's $92,500 award for breach of the 1999 agreement, on the ground that Trinity failed to present any nonspeculative basis for determining the profits it allegedly lost by reason of the alleged breach. The court declined, however, to disturb the much larger award for breach of the alleged 2001 modification. Verizon now appeals from the ensuing judgment. No appeal has been taken by Trinity.

At the outset, it should be noted that the trial court's setting aside of the entire award for breach of the original 1999 agreement (i.e., as it existed prior to the alleged 2001 modification), from which no appeal has been taken, renders essentially moot the question of whether there was evidence to support the jury's finding that Verizon breached the original 1999 agreement. Thus, we need only consider issues relating to the second cause of action, based on the alleged breach of the alleged 2001 modification.

I do not, of course, take issue with this Court's holding on the prior appeal that, on the pretrial record, a triable issue existed as to "whether [Trinity] was acting under the terms of the [1999] agreement or some new arrangement when it continued to perform emergency services" (38 AD3d at 283) after receiving Verizon's January 2001 letter "suspend[ing]" the performance of other services under the 1999 agreement. Thus, I take it as given that a rational factfinder could conclude, based on the *pretrial* record, that Verizon's January 22, 2001 letter and Trinity's February 14, 2001 letter (both of which were rather vague and ambiguous) gave rise to a modification of the terms of the 1999 agreement. Based on the trial record, however, I fail to see how a rational factfinder could reach such a conclusion in view of the trial testimony of Trinity's own principal, Alan Loch. It seems to me that the following testimony by Loch completely destroys any rational basis for finding that the early 2001 letter exchange gave rise to any new or modified agreement between the parties:

"Q. Now, there was only one contract, correct?

"A. Yes.

"Q. This one contract that was the subject of your letter and there was one contract only.

"A. Yes, ma'am.

"Q. You had no separate side agreements with Verizon for the 291 [thousand dollars], did you?

"A. No, we didn't."

Later, the testimony continued as follows:

"Q. Where is the $291,000 that Verizon supposedly agreed to pay you?

"A. It had nothing to do with this amendment [raising the hourly rate], didn't have anything to do with it.

"Q. Because Verizon never agreed to pay that, correct?

"A. They didn't agree to do the honorable thing. They broke one promise after another.

"Q. Did they ever promise to pay you $291,000 a year?

"A. They never—

"Q. Did they, sir, yes or no?

"A. Al Mora [at Verizon], it was hard to even contact him.

"Q. Did they promise to pay you $291,000?

"A. No, they didn't."

Further confirming that there never was any agreement that Verizon would pay Trinity $291,782 per year, Loch admitted that Trinity never sent Verizon an invoice for the payment of any such annual fee. By contrast, throughout the relationship, Verizon was billed at the contractual rates for the services Trinity provided, and all such invoices were paid in full:

"Q. Anywhere, you have any invoice anywhere that says oh, by the way, you owe me $291,782 times two, you have a single invoice—

"A. I asked Verizon to cancel the contract.

"Q. Did you ever invoice them for the money?

"A. I did not.

"Q. Did they pay you every cent you invoiced them?

"A. They didn't pay me every cent they owed me but they paid—

"Q. What you invoiced, they paid, correct?

"A. Yes."

Still more confirmation that no agreement on an annual fee arose from the letters exchanged in early 2001 is provided by two letters from Loch to Verizon, one from October 2001 and the other from March 2002 (the latter of which led to the amendment increasing Trinity's hourly rates). While each of these letters complains bitterly about the effect on Trinity of Verizon's suspension of most services under the 1999 agreement, there is not a word in either one of them suggesting that, since February 2001, Trinity had been earning a fixed annual fee of $291,782, in addition to the fees it earned for services actually performed.

In view of the foregoing trial evidence, I believe that Verizon

was entitled to dismissal of Trinity's second cause of action as a matter of law. It is plain that the verdict was based, not on the evidence, but on sympathy for a small business that entered into a disadvantageous agreement with a corporate giant. In our legal system, this is not an appropriate basis for the imposition of liability. [*See* 2007 NY Slip Op 31164(U).]