**Marshall MANLEY, Plaintiff,**

v.

**AMBASE CORPORATION, Defendant.**

**No. 96 CIV. 9503(RJW).**

United States District Court,
S.D. New York.

Jan. 8, 2001.

McCullough, Goldberger & Staudt by William Simon, White Plains, NY, for Plaintiff.

Collier, Cohen & Halpern, LLP by Philip M. Halpern, White Plains, NY, for Defendant.

## OPINION

WARD, District Judge.

Plaintiff Marshall Manley brought this action against defendant AmBase Corporation ("AmBase") for breach of contract. AmBase filed counterclaims alleging fraud and seeking reformation of the contract and damages. The Court held a bifurcated trial. Manley's breach of contract claim

was tried to a jury which rendered a verdict in favor of Manley in the amount of $1.8 million.[1] Tr. at 826–27.[2] On consent of both parties, AmBase's counterclaims were tried to the Court. Tr. at 834–35. The following constitute the Court's findings of fact and conclusions of law with respect to AmBase's counterclaims.

## FINDINGS OF FACT

### I. Manley's Employment at AmBase and Finley Kumble

In 1985, George Scharffenberger, Chairman and Chief Executive Officer of the Home Group Inc. (the "Home Group"), which later became AmBase, asked Manley to work at the Home Group. Tr. at 65. He requested that Manley join the Home Group as President and serve as Chairman of the Home Group's subsidiary, the Home Insurance Company. *Id.* at 67. Manley commenced his employment in these two positions in March 1985. *Id.* at 71. In May 1985, Manley also became an officer of the Home Group's parent, City Investing Corporation ("City Investing"), *id.* at 168, 281, of which Scharffenberger was Chairman and Chief Executive Officer. *Id.* at 171.

Manley served as President from March 8, 1985, through March 15, 1990, and as a Director from March 8, 1985, through January 31, 1991. P.T.O. para. 2.[3] From December 18, 1987, through March 15, 1990, Manley served as Chief Executive Officer of the corporation. *Id.*

In 1981, prior to joining the Home Group, Manley incorporated Marshall Manley P.C., a California professional corporation, of which he was the sole shareholder. Marshall Manley P.C. served as a partner at the law firm of Finley, Kumble, Wagner, Heine, Underberg, Manley,

Myerson & Casey ("Finley Kumble"). Tr. at 44, 107, 180, 184; Def. Ex. B.[4] In discussions leading to Manley's employment, Scharffenberger requested that Manley remain at Finley Kumble after he commenced his position with the Home Group. *Id.* at 89–93. Manley did not tell anyone at the corporation about Scharffenberger's request that he continue to serve at Finley Kumble. *Id.* at 254–58. For clarity, the corporation will hereafter be referred to as AmBase.

AmBase had a custom and practice that requests by the corporation that its officers and directors serve at unaffiliated entities be made to the personnel committee which would, if appropriate, authorize them to do so. *Id.* at 473; Def. Ex. F, at 10–11, 26–27. This practice was followed to enable Manley to serve on the boards of other unaffiliated entities during his tenure at AmBase. J. Ex. 7, 8, 9, 11, 12, 18, and 21.[5] Manley never requested that the personnel committee of AmBase authorize him to continue serving at Finley Kumble. Tr. at 256.

Nevertheless, Scharffenberger and AmBase's Board of Directors knew that Marshall Manley P.C. was a partner at Finley Kumble while Manley was employed by AmBase. *Id.* at 82; J. Ex. 4, at 2; J. Ex. 6, at 1; J. Ex. 11, at 4; J. Ex. 42; J. Ex. 45. They also knew that Marshall Manley P.C. was receiving compensation from Finley Kumble at the same time Manley was receiving compensation from AmBase. Tr. at 469.

### II. Provisions for Indemnity in the By-laws and the Employment Agreement

AmBase's by-laws provide, in pertinent part:

---

1. In a decision filed on December 1, 2000, the Court set aside the jury's verdict and ordered a new trial on Manley's breach of contract claim. *See Manley v. AmBase,* 121 F.Supp.2d 758 (S.D.N.Y.2000).

2. References to "Tr." are to the trial transcript.

3. References to "P.T.O." are to the "Undisputed Facts" section of the parties' Joint Pre-Trial Order.

4. References to "Def. Ex." are to Defendant's Exhibits.

5. References to "J. Ex." are to Joint Exhibits.

The Company shall to the fullest extent permitted by applicable law as then in effect indemnify any person (the "Indemnitee") who *is or was* a director, Advisory Director or officer of the Company and who *is or was* involved in any manner (including, without limitation, as a party or a witness) or is threatened to be made so involved in any threatened, pending or completed investigation, claim, action, suit or proceeding, whether civil, criminal, administrative or investigative (including without limitation, any action, suit or proceeding by or in the right of the Company to procure a judgment in its favor) (a "Proceeding") by reason of the fact that such person *is or was* a director (including Advisory Director), officer, employee or agent of the Company, or *is or was* serving at the request of the Company as a director (including Advisory Director), officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (including, without limitation, any employee benefit plan), against all expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding .... Such indemnification shall be a contract right and shall include the right to receive payment in advance of any expenses incurred by the Indemnitee in connection with such Proceeding, consistent with the provisions of applicable law as then in effect.

J. Ex. 85 para. 23 (emphasis added).

On or about December 18, 1987, Manley entered into a written employment agreement with AmBase (the "1987 Employment Agreement"). J. Ex. 44; P.T.O. para. 3. With regard to indemnity, the 1987 Employment Agreement stated, in pertinent part:

11. *Indemnification.*

(a) If the Executive is made a party or is threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he *is or was* a director or officer of the Company or *is or was* serving at the request of the Company as a director, officer, member, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether or not the basis of such Proceeding is an alleged act or failure to act in an official capacity as a director, officer, member, employee or agent, he shall be indemnified and held harmless by the Company to the fullest extent authorized by Delaware law, as the same exists or may hereafter be amended, against all expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by the Executive in connection therewith, including, without limitation, payment of expenses incurred in defending a Proceeding prior to the final disposition of such Proceeding, and such indemnification shall continue as to the Executive even if he has ceased to be a director, officer, member, employee or agent of the Company or other enterprise and shall inure to the benefit of his heirs, executors and administrators.

J. Ex. 44 para. 11(a) (emphasis added).

## III. The Finley Kumble Bankruptcy

In February 1988, Finley Kumble became the subject of an involuntary petition under the federal bankruptcy laws. P.T.O. para. 4. Francis Musselman, the trustee of the Finley Kumble bankruptcy estate (the "Trustee"), and certain creditors, commenced actions against Manley and Marshall Manley P.C. (the "Finley Kumble Bankruptcy Actions"). Tr. at 108; J. Ex. 87, 88; P.T.O. para. 5.

Manley told Scharffenberger about the Finley Kumble Bankruptcy Actions. AmBase then retained the law firm of Cra-

vath, Swaine & Moore ("Cravath") to defend Manley in these actions. Tr. at 109–10; P.T.O. para. 6. In addition, AmBase retained a bankruptcy law firm, Zalkin, Rodin & Goodman ("Zalkin"), and an accounting firm, Grant Thornton, to assist Manley in his defense of the Finley Kumble Bankruptcy Actions. P.T.O. para. 7. AmBase paid the fees of Cravath, Zalkin, and Grant Thornton. Tr. at 111; P.T.O. para. 8.

The minutes of the meeting of AmBase's Board of Directors held on May 20, 1988, reflect the following:

Mr. Pyne reported that by reason of the well publicized reorganization proceeding affecting the Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey law firm, the President was being required to devote considerable time to dealing with claims and charges concerning his former role with that firm to the detriment of his ability to devote his undivided attention to the Company's affairs. Upon discussion, it was deemed prudent that the Company retain Messrs. Cravath, Swaine & Moore to assist Mr. Manley in the administration and supervision of claims attributable to the reorganization and various litigations associated therewith in order to minimize the distraction of Mr. Manley from the Company's affairs. Upon the recommendation of the Personnel Committee and in order to minimize the distraction of the President from Company affairs, following discussion, upon motion duly made, seconded and unanimously carried (with Mr. Manley abstaining), it was

RESOLVED that the Company retain Cravath, Swaine & Moore and such other attorneys and experts, as may be appropriate, at Company expense, to assist Mr. Manley in the administration and supervision of claims affecting him and arising subsequent to his date of employment by the Company or its subsidiaries, which may arise in connection with, or may occur as a result of, his

association with Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey.

J. Ex. 17, at 18–19.

From February 1988 to March 1990, Manley discussed the Finley Kumble Bankruptcy Actions with Scharffenberger on numerous occasions. Tr. at 119. He told Scharffenberger about the claims against him, id. at 120–21, the defenses he had asserted, id. at 150–52, and the prospects for settlement, including settlement offers. Id. at 152–53.

However, Paul Dodyk, the Cravath partner who represented Manley, did not report to AmBase regarding the progress of the Finley Kumble Bankruptcy Actions. Id. at 312–13. Furthermore, Cravath's legal bills rendered to AmBase for payment did not detail the services provided to Manley by Dodyk but only provided general descriptions of the multiple projects on which Dodyk and other Cravath attorneys worked. Id. at 1017–25; J. Ex. 240.

Pursuant to a court order, Manley and Marshall Manley P.C. were regularly required to provide detailed financial information, including assets, liabilities, income, and expenses to the Trustee. Between September 15, 1988 and March 12, 1990, Dodyk, on behalf of Manley, provided financial information to the Trustee and periodically updated the information. Tr. at 511–20; J. Ex. 77, 90, 130A, 131, 132, 133, 135, 137, 139, 164, 165. From at least September 15, 1988, the date of the first submission of financial information to the Trustee, Dodyk knew Manley had a potential claim for indemnification against AmBase but chose not to disclose it to the Trustee. He testified at trial that he believed it was not the type of asset relevant to, or requested by, the Trustee. Tr. at 299–300, 306–07. At no time up to and including the date on which Manley and Marshall Manley P.C. settled with the Trustee did Manley disclose, or authorize Dodyk to disclose, to the Trustee Manley's potential claim for indemnification against

AmBase for the payments he would make to the Trustee. *Id.* at 231–32, 269, 299–300.

### IV. The 1991 Severance Agreement

On March 15, 1990, while the Finley Kumble Bankruptcy Actions were pending, AmBase terminated Manley from his positions as Chief Executive Officer and President. Manley remained a member of AmBase's Board until January 31, 1991, at which time he was terminated from his position as a Director. P.T.O. paras. 2, 11.

After AmBase terminated Manley, he began to write letters to AmBase demanding indemnification for litigations unrelated to the Finley Kumble Bankruptcy Actions. J. Ex. 223–26, 228, 231–33, 235–37. He also continued to communicate with Scharffenberger regarding the status of the Finley Kumble Bankruptcy Actions. Tr. at 121–22; J. Ex. 242, at 1.

On January 31, 1991, AmBase entered into an agreement with Manley which purported to resolve Manley's claims against AmBase arising out of his termination (the "1991 Severance Agreement"). J. Ex. 48, 49; P.T.O. para. 12. The 1991 Severance Agreement stated, "AmBase shall continue to pay reasonable fees and expenses incurred by its counsel currently representing you in the liquidation proceedings involving Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey." J. Ex. 48 para. 6. The agreement also provided:

> The Company shall indemnify and defend you in connection with matters arising from your service as a Director, officer or employee of AmBase and its subsidiaries or affiliates to the extent provided for under the by-laws of AmBase or any indemnification agreement in effect as of the Execution Date between yourself and AmBase and any of its subsidiaries and affiliates, in each case to the extent permitted under applicable law; *provided that* in any case AmBase shall indemnify you (and provide you with a defense) with respect to

any events or circumstances for which AmBase may from time to time be indemnifying and defending individuals who have held positions at AmBase (or its subsidiaries or affiliates) comparable to the positions held by you prior to your resignation, to the extent permitted under applicable law.

J. Ex. 48 para. 7.

### V. The 1991 Trustee Settlement Agreement

Manley and Marshall Manley P.C. entered into a settlement agreement with the Trustee, dated September 24, 1991 (the "1991 Trustee Settlement Agreement"), which resolved the Finley Kumble Bankruptcy Actions against them in exchange for certain undertakings and future payments to be made by Manley. P.T.O. para. 9. Under the agreement, Manley was required to pay $1.452 million four years after the date of the agreement and $1.68 million five years after the date of the agreement. He was also required to pay a percentage of his income in the sixth year after the date of the agreement and continue to do so until 2001. Tr. at 126–27. The present value of the settlement in 1991 was estimated to be $4.5 million. When Manley entered into the 1991 Trustee Settlement Agreement, he was still represented by Cravath, Zalkin, and Grant Thornton. *Id.* at 125. Dodyk negotiated the agreement on Manley's behalf. *Id.* at 125, 306–07.

Soon after it was executed, Manley told Scharffenberger that he had entered into the 1991 Trustee Settlement Agreement. *Id.* at 232–35. The agreement was also disclosed to the Bankruptcy Court by the Trustee, and was the subject of articles in the press. P.T.O. para. 10.

### VI. The 1991 AmBase Action and 1993 AmBase Settlement Agreement

On October 22, 1991, Manley filed an action against AmBase (the "1991 AmBase Action"). J. Ex. 85; P.T.O. para. 13. In

the Third Claim for Relief, Manley sought a declaration that he was entitled to indemnification for various shareholder derivative actions and other litigations. Paragraph 24 of the complaint listed eighteen litigations for which Manley was seeking indemnification. J. Ex. 85, at 8–9, para. 24. Neither paragraph 24 nor any other portion of the complaint in the 1991 AmBase Action identified the Finley Kumble Bankruptcy Actions or Manley's obligation to make payments to the Trustee. Manley never amended the complaint to identify the Finley Kumble Bankruptcy Actions, or his obligation to make payments to the Trustee. Tr. at 562.

However, by February 27, 1992, at his deposition in the 1991 AmBase Action, Manley complained to AmBase's attorney that AmBase had stopped paying Cravath's fees. Id. at 238–39, 271, 874; Def. Ex. A, at 200–01. The statement regarding AmBase's failure to continue paying Cravath's fees was repeated in an affidavit, executed by Manley on June 12, 1992. J. Ex. 91 para. 41.

Manley and AmBase resolved the 1991 AmBase Action pursuant to a written agreement dated May 27, 1993 (the "1993 AmBase Settlement Agreement"). P.T.O. para. 14. The terms of the 1993 AmBase Settlement Agreement were negotiated by Manley and Richard Bianco, President and Chief Executive Officer of AmBase since May 1991, through their attorneys. Tr. at 877, 930–33. Manley was represented by Peter Calamari, id. at 561–62, 596–97, 975–76, 999, and AmBase was represented by Colleen McMahon of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss"). Id. at 596.

During these negotiations, although the subject of indemnification was generally discussed, specific matters which would, or would not, be covered by the agreement, were not discussed. Id. at 564, 977, 1006. AmBase did not ask for either a verbal or written itemization of indemnity claims nor did Manley provide one. Id. at 889, 900, 1035–36. McMahon never discussed in-

demnification for the payments Manley would make to the Trustee in the Finley Kumble Bankruptcy Actions with Calamari or Manley. Id. at 892–93. Calamari testified that he did not know whether Manley intended to assert an indemnity claim with regard to the Finley Kumble Bankruptcy Actions. Id. at 1008. During the entire time these negotiations were ongoing, Manley was no longer an officer or director of AmBase and his only contact with AmBase was as an adversary in a lawsuit. Id. at 977–78.

Bianco testified that by entering into the 1993 AmBase Settlement Agreement, he intended that Manley would have indemnity for those litigations Manley identified in paragraph 24 of the complaint in the 1991 AmBase Action. Id. at 932. Since becoming President and Chief Executive Officer of AmBase, Bianco knew of no obligation on the part of AmBase which existed regarding the payments Manley was to make, and did make, to the Trustee arising out of the Finley Kumble Bankruptcy Actions. Id. at 942, 952–55. Manley never told Bianco or anyone else at AmBase of such an obligation. Id. at 234–35, 930, 942, 952–55.

Manley and Bianco had several discussions on the telephone and in person in April and May 1993 regarding settlement of the 1991 AmBase Action. Id. at 930–33. They discussed indemnification for the lawsuits listed in paragraph 24 of the complaint in the 1991 AmBase Action, as well as other lawsuits and administrative proceedings which were brought against Manley after the commencement of the 1991 AmBase Action and before the execution of the 1993 AmBase Settlement Agreement. Id. at 932–33. However, they did not discuss indemnification for the Finley Kumble Bankruptcy Actions or the payments Manley was to make to the Trustee. Id. at 932.

By entering into the 1993 AmBase Settlement Agreement with Manley, Bianco hoped to end all present and future litiga-

tion by Manley against AmBase. *Id.* at 939–40. Manley indicated to Bianco that he agreed that this was the purpose of the 1993 AmBase Settlement Agreement. *Id.* at 940. Bianco stated that he relied on Manley's sincerity in this regard. *Id.* at 940–41. Accordingly, the 1993 AmBase Settlement Agreement contains the following "whereas" clause: "WHEREAS, the parties wish to settle all their disputes, to end all pending litigation between them and to end the prospect of further litigation between them." J. Ex. 68, at 2.

On April 21, 1993, Calamari faxed to McMahon's associate a first draft of the settlement agreement, which Calamari had prepared. J. Ex. 58. Subsequently, Calamari asked McMahon to incorporate the language of the indemnification paragraph of Manley's 1987 Employment Agreement into the settlement agreement in place of the language Calamari had originally prepared. Calamari and McMahon discussed the prior settlement negotiations which resulted in the 1991 Severance Agreement in which Manley had expressed concern about pending shareholder derivative actions, and Manley's prior and continuing desire not to be cast adrift regarding such actions. Tr. at 883–84.

McMahon faxed a revised draft settlement agreement to Calamari on April 30. Paragraph 5 of this draft was copied from paragraph 11 of the 1987 Employment Agreement, and inserted pursuant to Calamari's specific request. *Id.* at 880–84; J. Ex. 61. Paragraph 5(a) of the April 30 draft commenced with the language: "If Manley *is* made a party . . . ." J. Ex. 61 (emphasis added). When Calamari received this draft, which contained the term "is," he expressed concern to McMahon that her use of the word "is" was an attempt to limit the scope of the indemnity to liabilities arising prospectively and to exclude potential liabilities which may have arisen in the past from shareholder derivative litigations, but McMahon assured him that this was not so. Tr. at 885, 1004–05. McMahon understood the shareholder de-

rivative litigations identified by Calamari to be the litigations enumerated in paragraph 24 of the complaint in the 1991 AmBase Action. *Id.* at 885–91; J. Ex. 85. She also testified that she believed the indemnity provision in the 1993 AmBase Settlement Agreement was to be neither broader nor narrower than the indemnification rights previously possessed by Manley, and was to provide Manley with the full scope of indemnity rights available under Delaware law. *Id.* at 883–84, 895, 976–77, 1034.

On May 5, Calamari faxed to McMahon a marked up version of the April 30 draft. Calamari inserted the language "has been or" at the beginning of paragraph 5(a) so that it read: "If Manley has been or is made a party . . . " J. Ex. 63. McMahon *did not object to this language.* Paragraph 5 of the final version of the 1993 AmBase Settlement Agreement provided, in pertinent part:

5. (a) If Manley has been or is made a party or is threatened to be made a party to any action, suit or proceeding . . . by reason of the fact that he was a director or officer of AmBase or any current or former subsidiary of AmBase, or by reason of the fact that he was serving at the request of AmBase as a director, officer, member, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise . . . he shall be indemnified and held harmless by AmBase to the fullest extent authorized by Delaware law, as the same exists or may hereafter be amended, against all expense, liability and loss . . . reasonably incurred or suffered by Manley in connection therewith, including, without limitation, payment of expenses incurred in defending a Proceeding prior to the final disposition of such Proceeding.

(b) If a claim under ¶ 5(a) is not paid in full by AmBase within 30 days after a written claim has been received by the Company, Manley may at any time thereafter bring suit against AmBase to

recover the unpaid amount of the claim and, if successful in whole or in part, Manley shall be entitled to be paid also the expense of prosecuting such claim. It shall be a defense to any such action that Manley has not met the standards of conduct which make it permissible under Delaware law for the Company to indemnify him for the amount claimed; *provided however*, that the allegations, facts and circumstances which form the basis of any claims that AmBase asserted against Manley in the Action shall not be considered as a basis for refusing any indemnification which Manley is otherwise entitled to hereunder or at law....

(c) The right to indemnification and the payment of expenses incurred in defending a Proceeding in advance of its final disposition conferred in this ¶ 5 shall not be exclusive of any other right that Manley may have under any statute, provision of the certificate of incorporation or by-laws of AmBase, agreement, vote of stockholders or disinterested directors or otherwise.

J. Ex. 68 para. 5.

Bianco testified that he read and understood the 1993 AmBase Settlement Agreement before it was signed. *Id.* at 1014. He first testified that based upon conversations with Manley, he thought the indemnity provided for in the 1993 AmBase Settlement Agreement was limited to the list of lawsuits set forth in the complaint in the 1991 AmBase Action, *id.* at 932, 939, 1042, but later testified that it also included certain later-filed actions which he and Manley had discussed. *Id.* at 1043, 1046–47.

## VII. Requests for Payment of Fees

On June 22, 1993, several weeks after the execution of the 1993 AmBase Settlement Agreement, Manley sent a letter to AmBase enclosing a bill for $53,038.88 from Grant Thornton for services rendered in the Finley Kumble Bankruptcy Actions and asking that AmBase pay the bill (the "June 22 Letter"). Tr. at 139–40, 947–48; J. Ex. 67, 70. The June 22 Letter stated, in pertinent part:

> Please find enclosed a copy of a letter dated June 22, 1993, which I received from Grant Thornton.
>
> The enclosed bill comes under the indemnification provisions of my recent settlement agreement with AmBase, and previous settlement agreements with AmBase.
>
> Please arrange to have the enclosed bill paid.

J. Ex. 67 at 1.

AmBase agreed to pay $40,000 in settlement of the bill. J. Ex. 70. According to Bianco, the bill was paid to accommodate Grant Thornton and preserve a longstanding business relationship. Tr. at 948–49.

On September 15, 1993, Manley sent a letter (the "September 15 Letter") to AmBase enclosing a bill from Cahill, Gordon & Reindel ("Cahill") for $63,519.93 and asking AmBase to pay the bill. Tr. at 142; J. Ex. 73. The bill did not cover any services in connection with the Finley Kumble Bankruptcy Actions. J. Ex. 73. The September 15 Letter stated, in pertinent part:

> Please find enclosed a copy of a letter dated September 2, 1993 and the enclosures referred to therein which I have received from Mathias Mone of the law firm of Cahill Gordon & Reindel.
>
> To refresh your recollection, Cahill Gordon & Reindel law firm was hired directly by AmBase to provide legal services in the matters referred to in the enclosed documents. During the course of the recent litigation I had with AmBase, AmBase decided to substitute Cravath Swaine & Moore in place of Cahill Gordon & Reindel. Since the enclosed items are a direct obligation of AmBase (because you hired Cahill Gordon & Reindel) and also because the charges would come under my indemnification rights as more fully set forth in my most recent settlement with AmBase, will you

please forward a check directly to Mr. Mone.

J. Ex. 73 at 1.

AmBase agreed to pay $57,000 in settlement of the bill. According to Bianco, the bill was paid to accommodate Cahill and preserve a longstanding business relationship between AmBase and Cahill. Tr. at 949–52; Def. Ex. N.

Bianco did not think the requests contained in the June 22 Letter and the September 15 Letter were appropriate. Tr. at 356–57. Nevertheless, he authorized the payment of the Grant Thornton bill after consultation with counsel. *Id.* at 948. The AmBase check authorization form issued in connection with the payment states that the check was to cover "Compromised payment re: Manley Settlement." J. Ex. 70.

## VIII. The 1993 Trustee Settlement Agreement

On December 30, 1993, Manley and Marshall Manley P.C. entered into a settlement agreement (the "1993 Trustee Settlement Agreement") with Albert Togut, the Finley Kumble Liquidation Trustee ("Liquidation Trustee"), pursuant to which Manley and Marshall Manley P.C. agreed to pay $2.43 million in full satisfaction of all sums due under the 1991 Trustee Settlement Agreement. J. Ex. 75. Manley paid the Liquidation Trustee $2.43 million. Tr. at 145; J. Ex. 81. The Finley Kumble Bankruptcy Actions against Manley and Marshall Manley P.C. were dismissed with prejudice by the Bankruptcy Court on October 12, 1994. J. Ex. 84.

During the negotiations with the Liquidation Trustee which led to the 1993 Trustee Settlement Agreement, Manley retained Calamari at his own expense. He entered into the agreement without the knowledge or participation of AmBase.

By letter dated July 22, 1996, Manley, through his counsel, made a demand upon AmBase to indemnify him for the $2.43 million paid to the Liquidation Trustee. J. Ex. 126. AmBase first learned of this claim when it received Manley's demand letter. Tr. at 942. By letter dated October 3, 1996, AmBase rejected the demand. J. Ex. 127. Manley testified that he did not disclose this claim earlier because he was beholden to AmBase for his defense and indemnity in pending shareholder derivative litigations. Tr. at 274–75. He was afraid that if he made a claim for indemnification, AmBase would not continue paying his attorneys in connection with the shareholder derivative litigations. *Id.* at 275.

## CONCLUSIONS OF LAW

### I. Reformation

■ AmBase seeks reformation of the 1993 AmBase Settlement Agreement. Reformation may be granted if there is either mutual mistake or unilateral mistake coupled with fraudulent concealment and the writing does not reflect the actual agreement reached between the parties. *See Winmar Co. v. Teachers Ins. and Annuity Ass'n of Am.*, 870 F.Supp. 524, 535 (S.D.N.Y.1994) (citing *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231, 232–34 (1986)); *Weed v. Weed*, 222 A.D.2d 800, 634 N.Y.S.2d 569, 570 (1995). AmBase relies on a unilateral mistake coupled with fraudulent concealment to support its reformation claim. The theory behind such a claim is that "the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement." *Chimart Assocs.*, 498 N.Y.S.2d 344, 489 N.E.2d at 234.

■ Because the thrust of a reformation claim is that the writing does not set forth the actual agreement of the parties, the parol evidence rule generally does not apply to bar proof of the claimed agreement between the parties. However, in order to avoid the danger that a party to a mutually agreed upon written contract that turns out to be disadvantageous will falsely claim the existence of a different

agreement, New York courts limit actions for reformation by imposing a heavy burden of proof. *See id.*

> [T]here is a "heavy presumption that a deliberately prepared and executed written instrument manifests[s] the true intention of the parties," and a correspondingly high order of evidence is required to overcome that presumption. The proponent of reformation must "show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties."

*Id.* (citations omitted). Fraud must be "clearly established, particularly when the negotiations were conducted by sophisticated, counseled business people." *Briand Parenteau Assocs. v. HMC Assocs.*, 225 A.D.2d 874, 638 N.Y.S.2d 817, 819 (1996) (citing *Chimart Assocs.*, 498 N.Y.S.2d 344, 489 N.E.2d at 233–34). The burden of proof imposed here has been equated to a clear and convincing evidence standard. *See, e.g., Winmar*, 870 F.Supp. at 535–36.

McMahon and Bianco testified that they believed that the indemnity provisions in the 1993 AmBase Settlement Agreement only covered certain previously identified litigations. However, there was also persuasive evidence that both parties intended that Manley would have the same indemnification rights that he previously possessed, a fact which AmBase does not contest. The parties carried out their intent by including in the 1993 AmBase Settlement Agreement language originally contained in Manley's 1987 Employment Agreement. By agreeing to that language, AmBase got what it bargained for, an indemnity provision that would provide Manley with the full scope of indemnity rights that were permitted under Delaware law.

█ The Court therefore concludes that AmBase has failed to establish that the 1993 AmBase Settlement Agreement does not reflect the actual agreement between the parties. Thus, AmBase's reformation counterclaim fails and it is not necessary to reach the issue of whether Manley fraudulently concealed information from AmBase. However, since AmBase also seeks money damages on its fraud counterclaim, the Court will now consider that issue.

## II. Fraudulent Concealment

The fraud counterclaim is based on Manley's alleged fraudulent concealment of information regarding his intent to claim a right to indemnification for the sums paid to resolve the Finley Kumble Bankruptcy Actions. AmBase argues that it was fraudulently induced to enter into the 1993 AmBase Settlement Agreement and that Manley has continued to perpetrate the fraud to the present day.

█ In order to state a claim for fraudulent concealment under New York law, AmBase must show that (a) Manley failed to disclose material information which he had a duty to disclose, (b) Manley intended to defraud AmBase, (c) AmBase reasonably relied upon the representation, and (d) AmBase suffered damage as a result of such reliance. *See, e.g., Bermuda Container Line Ltd. v. International Longshoremen's Ass'n*, 192 F.3d 250, 258 (2d Cir.1999); *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995). Each of these elements must be proved by clear and convincing evidence. *See Banque Arabe*, 57 F.3d at 153. For the following reasons, AmBase has failed to sustain its burden of proof.

### A. Manley's Duty to Disclose Information

█ "Absent a duty to speak, nondisclosure does not ordinarily constitute fraud." *Jolly King Restaurant, Inc. v. Hershey Chan Realty, Inc.*, 214 A.D.2d 422, 625 N.Y.S.2d 35, 36 (1995) (citations omitted). When two parties are engaged in business negotiations, a duty to speak only arises in three limited circumstances. *See, e.g., Brass v. American Film Technol-*

*ogies Inc.*, 987 F.2d 142, 150 (2d Cir.1993) ("A duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of *caveat emptor* is still alive and well." (citations omitted)). First, such a duty may arise from the need to complete or clarify a partial or ambiguous statement. Second, a duty to disclose may arise from a fiduciary relationship between the parties. Third, a duty to disclose may arise if one party has superior knowledge of certain information, that information is not readily available to the other party, and the first party knows that the second party is acting on the basis of mistaken knowledge. *See Banque Arabe*, 57 F.3d at 155; *Brass*, 987 F.2d at 150. For the reasons discussed below, none of these circumstances applies in the present case.

### 1. Partial or Ambiguous Statement

██ AmBase argues that Manley had a duty to disclose his alleged right to indemnification for payments he was to make in settlement of the Finley Kumble Bankruptcy Actions because he made partial statements in the 1991 AmBase Action and in negotiations leading to the 1993 AmBase Settlement Agreement. By seeking indemnification for the litigations identified in paragraph 24 of the complaint in the 1991 AmBase Action, AmBase reasons that Manley also imposed on himself a duty to disclose his alleged right to indemnity for the Finley Kumble Bankruptcy Actions.

Regarding the making of a partial or ambiguous statement, the Second Circuit has stated that "once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth." *Brass*, 987 F.2d at 150 (citing *Junius Const. Corp. v. Cohen*, 257 N.Y. 393, 178 N.E. 672, 674 (1931)). By listing the eighteen litigations for which he was seeking indemnification in the 1991 AmBase Action, Manley did not fail to disclose any material information to AmBase. At the time, he was not seeking indemnification in connection with the Finley Kumble Bankruptcy Actions since he was not required to make the first payment to the Trustee until four years after the commencement of the 1991 action. In any event, AmBase was aware that Manley had entered into the 1991 Trustee Settlement Agreement at the time, or soon after, it was executed. At that point, AmBase had sufficient knowledge of other indemnity provisions, for example, its by-laws, the 1987 Employment Agreement, the 1988 Board resolution, and the 1991 Severance Agreement, to ascertain whether Manley had a potential claim for indemnification.

During the negotiations leading to the 1993 AmBase Settlement Agreement, Manley never represented to anyone affiliated with AmBase that he was only seeking indemnification for the litigations enumerated in paragraph 24 of the complaint in the 1991 AmBase Action. AmBase never sought, and Manley never provided, a list of the actions for which he would seek indemnification. Thus, Manley never made a partial or ambiguous statement to AmBase which would have required him to provide additional information.

### 2. Fiduciary Relationship

██ AmBase also argues that Manley owed it a duty to disclose his potential indemnity claim because he had a fiduciary relationship as a director and officer of AmBase which continued after he was terminated. It is a well-established principle of New York law that "directors are bound by all those rules of conscientious fairness, morality, and honesty in purpose which the law imposes as the guides for those who are under the fiduciary obligations and responsibilities. They are held, in official action, to the extreme measure of candor, unselfishness, and good faith." *Kavanaugh v. Kavanaugh Knitting Co.*, 226 N.Y. 185, 123 N.E. 148, 151 (1919). Generally, such a duty ceases to exist once an officer or director no longer occupies his or her position or when an officer or director

is not acting in his or her official capacity. *See, e.g., Keehan v. Keehan,* No. 96 Civ. 2481, 2000 WL 502854, at *4 (S.D.N.Y. April 25, 2000) (stating that if the facts proved that an individual continued in his role as an officer or director until a certain date, his fiduciary duty to the corporation would endure until that date as well, but if he resigned earlier, his fiduciary duty would have ended on the earlier date); *Bensen v. American Ultramar Ltd.,* No. 92 Civ. 4420, 1997 WL 66780, at *22–23 (S.D.N.Y. Feb. 14, 1997) (finding that an officer and director was not a fiduciary thus giving rise to a duty to disclose in a fraud action where, in the context of the transaction in question, the officer and director was acting as an individual, not in any of his official capacities); *Nichols–Morris Corp. v. Morris,* 174 F.Supp. 691, 698 (S.D.N.Y.1959) (finding that the duty of loyalty owed by the president and director of a corporation continued as long as he remained in those positions and ended when it appeared, unequivocally, that a complete withdrawal from the corporation had been effected); *Commonwealth Sanitation Co. v. Fox,* 107 N.Y.S.2d 935, 938 (1951) (finding that the fiduciary duty of a director and officer ceased to exist once the director and officer was summarily dismissed without just cause).[6]

 AmBase argues that Manley had a duty to speak in connection with the 1991 AmBase Action, which was commenced on October 22, 1991, almost nine months after he was terminated from his position as a director at AmBase. It also argues that Manley had a duty to speak during the negotiations leading up to the 1993 AmBase Settlement Agreement. However, Manley was under no fiduciary duty to AmBase once he was terminated from his position as a director on January 31, 1991, and therefore, he had no duty to disclose

to AmBase that he had a potential indemnity claim arising out of the Finley Kumble Bankruptcy Actions.

### 3. Superior Knowledge

 Finally, AmBase argues that Manley had superior knowledge concerning his potential indemnity claim which was not readily available to AmBase. In order to establish that Manley had a duty to disclose material information based on his superior knowledge, AmBase must prove: (1) that Manley had such superior knowledge; (2) that the information was not readily available to AmBase; and (3) that Manley knew that AmBase was acting on the basis of mistaken knowledge. *See Banque Arabe,* 57 F.3d at 155.

Even assuming that Manley had knowledge of his potential claim for indemnity arising out of the Finley Kumble Bankruptcy Actions, that information was readily available to AmBase. Prior to the commencement of the 1991 AmBase Action, AmBase was aware that Manley had entered into the 1991 Trustee Settlement Agreement. At that point AmBase, having knowledge of the various indemnity provisions that applied to Manley, for example, AmBase's by-laws, the 1987 Employment Agreement, the 1988 Board resolution, and the 1991 Severance Agreement, could have discovered that Manley might have an indemnity claim for his liability in the Finley Kumble Bankruptcy Actions. AmBase also had retained counsel and accountants to represent Manley in the Finley Kumble Bankruptcy Actions. In sum, AmBase had sufficient information concerning Manley's potential claim for indemnification.

For the same reasons, AmBase has not proved that Manley knew that AmBase was acting on the basis of mistaken knowl-

**6.** There are some circumstances, none of which are applicable here, in which the fiduciary duty of an officer and director continues after he leaves his fiduciary position with the corporation. *See, e.g., American Federal Group, Ltd. v. Rothenberg,* 136 F.3d 897, 914 (2d Cir.1998); *Abbott Redmont Thinlite Corp. v. Redmont,* 475 F.2d 85, 88 (2d Cir.1973); *Gerdes v. Reynolds,* 28 N.Y.S.2d 622, 651 (1941); *see also* Restatement (Second) of Agency § 396 (1957).

edge when it entered into the 1993 AmBase Settlement Agreement. Based on the foregoing discussion of AmBase's knowledge, Manley could reasonably have assumed that AmBase was aware of the potential claim for indemnity when it entered into the 1993 AmBase Settlement Agreement. Therefore, the Court finds that AmBase has not proved the first element of its fraud counterclaim.

### B. Manley's Intent or Scienter

■ In order to satisfy the scienter element of a claim for fraudulent concealment, a party must show by clear and convincing evidence that the other party was " 'more than negligent in [its] failure to disclose material facts.' " *Caron v. The Travelers Property and Cas. Corp.*, 71 F.Supp.2d 269, 275 (S.D.N.Y.1999) (alteration in the original) (quoting *Allen v. Westpoint–Pepperell, Inc.*, 11 F.Supp.2d 277, 288 (S.D.N.Y.1997)). Thus, AmBase must show that Manley either knowingly or recklessly disregarded the risk of omitting material facts. *See Allen*, 11 F.Supp.2d at 289. Even assuming that Manley concealed material information which he had a duty to disclose, the evidence presented at trial does not establish that Manley acted knowingly or recklessly.

■ With respect to Manley's omission of the Finley Kumble Bankruptcy Actions from paragraph 24 of the complaint in the 1991 AmBase Action, Manley testified that the reason for the omission was that the money due under the 1991 Trustee Settlement Agreement was not due until years later. Manley did not assert a claim for attorneys' fees since AmBase was paying Cravath's bills at the time. Furthermore, the fact that Manley did not notify anyone at AmBase that he would seek indemnification for the Finley Kumble Bankruptcy Actions during the negotiations leading up to the 1993 AmBase Settlement Agreement, does not, by itself, prove that Manley knowingly or recklessly disregarded the risk of omitting such information.

### C. Reasonable Reliance

■ AmBase claims that it reasonably relied on Manley's representations that the 1993 AmBase Settlement Agreement provided indemnification only for certain previously identified actions. In order to prove reliance, AmBase was required to demonstrate that it was "induced to 'act or [to] refrain from acting' to [its] detriment by virtue of the alleged misrepresentation or omission." *Shea v. Hambros PLC*, 244 A.D.2d 39, 673 N.Y.S.2d 369, 374 (1998) (quoting *Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 172 A.D.2d 209, 568 N.Y.S.2d 581, 584 (1991)). Furthermore, its reliance must be reasonable or justifiable. *See Bermuda Container Line*, 192 F.3d at 258 (citing *Banque Arabe*, 57 F.3d at 156).

■ Where sophisticated parties are engaged in arm's length negotiations and the party claiming reliance had an opportunity to discover the information allegedly relied upon, New York courts are wary of finding that such reliance was reasonable. *See, e.g., Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l*, 268 A.D.2d 373, 702 N.Y.S.2d 258, 259 (2000) (finding that a sophisticated institutional investor cannot claim justifiable reliance on an allegedly incomplete disclosure where its claim that it could not acquire the information itself was not supported by the record); *Shea*, 673 N.Y.S.2d at 374 (finding that where experienced business people were engaged in "acrimonious" negotiations conducted at arm's length in which there was dissension among the parties, plaintiff could not credibly claim that he entered into the agreements "lulled by faith or trust in the parties across the bargaining table"); *Siemens Solar Indus. v. Atlantic Richfield Co.*, 251 A.D.2d 82, 673 N.Y.S.2d 674, 674 (1998) (finding that the reasonable reliance element of a fraud cause of action was not viable where a sophisticated entity had opportunities to obtain knowledge of the matters that were subject to the alleged misrepresentations);

*Stuart Silver Assocs. v. Baco Dev. Corp.,* 245 A.D.2d 96, 665 N.Y.S.2d 415, 417–18 (1997) (finding that reliance was not justified where a party had the means to discover the true nature of the transaction by the exercise of ordinary intelligence and failed to make use of those means).

AmBase cannot claim reasonable or justifiable reliance. Like the parties in *Shea,* the parties in the present case were sophisticated business people, represented by counsel, who had a long history of contentious litigation leading up to the negotiation of the 1993 AmBase Settlement Agreement. Based on this history, and because AmBase was aware of Manley's indemnity rights contained in other documents, AmBase had the means to discover that Manley might assert a claim for indemnification in connection with the Finley Kumble Bankruptcy Actions. Therefore, AmBase's purported reliance on Manley's statement during a telephone conversation, that he hoped the 1993 AmBase Settlement Agreement would put an end to all litigation between the parties, was unreasonable. If the parties truly intended that the 1993 AmBase Settlement Agreement would only cover certain litigations, they could have identified them in the agreement. Since AmBase instead consented to an unambiguous and broad indemnity provision, it has failed to demonstrate that it reasonably relied on any misrepresentation made by Manley. Inasmuch as the Court has rejected the first three elements of AmBase's fraudulent concealment claim, it is not necessary to reach the issue of damages.

## CONCLUSION

For the foregoing reasons, AmBase is not entitled to judgment in its favor on its counterclaims for reformation and fraud, and the counterclaims are dismissed with costs.

It is so ordered.